**METROPOLITAN PAVING COMPANY,**
**Incorporated, et al., Plaintiffs-**
**Appellants,**

v.

**CITY OF AURORA, COLORADO and**
City of Colorado Springs, Colorado,
**Defendants-Appellees.**

**No. 364-70.**

United States Court of Appeals,
Tenth Circuit.

Sept. 24, 1971.

---

Stanley J. Norton, New York City (Norton, Sacks, Molineaux & Pastore, New York City, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., Barefoot, Moler & Claro, Oklahoma City, Okl., and Charles E. Grover, Denver, Colo., and David E. Montgomery, New York City, of counsel, on the brief), for plaintiffs-appellants.

Louis Johnson and R. E. Anderson, Colorado Springs, Colo. (Horn, Anderson & Johnson, Colorado Springs, Colo., on the brief), for defendants-appellees.

Before SETH, ADAMS*, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a contract dispute arising out of a contract for the construction of a major water delivery pipeline for the municipalities of Aurora and Colorado Springs. Metropolitan Paving Company, Incorporated, Gill Construction Company and Tecon Corporation, a joint venture hereinafter referred to as MGT, are the plaintiffs and as the general contractors assert claims both under the contract and for breach thereof. The aforesaid municipalities of Aurora and Colorado Springs, hereinafter referred to as the Cities, are defendants, and Bechtel Corporation, hereinafter referred to as Bechtel, was an additional party defendant. However, by agreement Bechtel was dismissed without

* Of the Third Circuit, sitting by designation.

prejudice from the proceedings before trial and that order of dismissal is not a part of this appeal.

The Cities retained Bechtel, a world-wide engineering and construction company, to make a feasibility study and then to prepare plans and specifications for the construction of a water diversion, storage and delivery system to bring water, diverted from the Arkansas River, to each of the Cities. In connection therewith, MGT eventually bid on and was awarded a contract to lay 55 miles of water delivery pipeline. The contract called for Bechtel to be the "manager and engineer" for the Cities in connection with the administration of the aforesaid contract. The contract price, incidentally, was roughly $15,-000,000, with MGT's bid being $2,500,-000 *less* than the bid of the next lowest bidder and some $5,000,000 less than Bechtel's estimate of the cost.

The contract generally called for MGT to excavate a trench, place bedding material in the bottom of the trench, install the pipe and then place backfill material around and above the pipe. The contract specified four types or "zones" of bedding and backfill material, namely, Zones 1, 2, 3 and 4, which were to be placed in a typical section of trench as follows: Zone 1 backfill material was to be placed under the pipe and up to the lower quarterpoints of the pipe;[1] Zone 2 backfill material was to be used only with steel pipe and was to be placed from the lower quarterpoints up to the springline; Zone 3 backfill material, with steel pipe, was to be placed from the springline to a point six inches above the pipe and, with concrete pipe, from the lower quarterpoints to six inches above the pipe; and Zone 4 backfill material was to be placed from a point six inches

above the pipe to varying elevations. When steel pipe was to be used, the contract provided that Zones 1, 2 and 3 were to be compacted, which means that after the material was placed in the trench it was to be compressed to provide greater density. When concrete pipe was used, Zone 1 and Zone 3 up to the springline were to be compacted, but from the springline on up Zone 3 was not required to be compacted. Zone 4 material was never required to be compacted.

As concerns the size of the bedding and backfill material, the contract provided that Zones 1 and 2 should contain no materials larger than three-quarters of an inch. The size limitation, if any, of Zone 3 material is the subject of one of the two disputes involved in the present appeal. There was no size limitation on Zone 4 material.

As indicated, one phase of the present controversy concerns the size limitation, if any, on Zone 3 backfill material. Concrete pipe, as opposed to steel pipe, was used by MGT. Hence, under the provisions of the contract above referred to, Zone 3 backfill material was to be placed from the lower quarterpoints of the concrete pipe to six inches above the pipe, with the material from the lower quarterpoints to the springline to be compacted.

The contract provisions relating to Zone 3 backfill material are as follows:

"12.2.44 *Zone Backfill Material.* Zone 3 backfill material shall consist of selected material from the trench excavation, free from frozen material and lumps or balls of clay, organic or other objectionable material. When compaction of Zone 3 backfill is called for the material shall be well graded and easily compacted throughout a

---

[1]. Going around the outside circumference of the pipe, the "springline" is the point on the side of the pipe halfway between the bottom and top of the pipe; the "lower quarterpoint" is the point halfway between the bottom and the springline; and the "upper quarterpoint" is the point halfway between the springline and the

top of the pipe. Diagramatically these points are as follows:

Upper quarterpoint....
Springline...........
Lower quarterpoint....

wide range of moisture content. Alternatively, if flooding, jetting and vibration are to be used for placing and compaction, the material shall meet the additional requirements specified in paragraph *Zone 1 and Zone 2 Bedding Material* for material to be placed and compacted by flooding, jetting and vibration. The maximum size shall pass a 2-inch U. S. Standard Series sieve."

In the relatively early stages of the work a dispute of debatable proportions arose concerning the size limitation, if any, on Zone 3 backfill. MGT was of the view that paragraph 12.2.44 imposed no size limitation whatsoever on Zone 3 backfill material, unless compaction was by flooding, jetting and vibration, in which event there was the 2-inch limitation. Bechtel and the Cities, however, were of the view that paragraph 12.2.44 imposed an overall 2-inch limitation on Zone 3 backfill material, and insisted that all Zone 3 backfill material meet the 2-inch test. MGT complied with this demand but later sought to be compensated for the cost, damage and expense of performing work which was "over and above" that called for by the contract. When their request was denied, MGT brought the present action seeking the sum of $3,549,045.

The second phase of the controversy concerns the subsurface conditions encountered in the area of the project known as Lambert's Meadow. The long and short of this dispute is that MGT contends that when it performed the excavation work in Lambert's Meadow it encountered an "extraordinary massed concentration of boulders" which continued throughout the particular area. Accordingly, MGT sought additional compensation for the additional work thus required and when the Cities refused their request MGT made claim as a part of the present proceeding to recover the additional sum of $144,698.-09.

### I. ZONE 3 BACKFILL

At trial all parties contended that the provisions of the contract relating to the composition of Zone 3 backfill material, namely, paragraph 12.2.44, were clear and unambiguous, though MGT argued for a meaning diametrically opposed to that urged by the Cities. As indicated, MGT contends that a fair reading of paragraph 12.2.44 can only lead to the conclusion that the 2-inch test applied only when there was compaction of Zone 3 material by flooding, jetting and vibration and that inasmuch as the compaction used in the instant case, when compaction was required, was by a mechanical method (not flooding, jetting and vibration), the 2-inch requirement accordingly had no application. The Cities contend that the contract is quite clear and unambiguous and requires Zone 3 backfill generally to pass the 2-inch sieve test. The practical effect of these divergent interpretations of paragraph 12.2.44 is at once apparent: (1) Under MGT's interpretation Zone 3 backfill material, which in the case of concrete pipe was to be placed from the lower quarterpoint to six inches above the pipe and was compacted by mechanical means from the lower quarterpoint to the springline, was subject to no size limitation; (2) whereas under the interpretation given the paragraph by the Cities, all such Zone 3 backfill material was required to meet the 2-inch test.

The trial court indicated that though there might well be some ambiguity as to the size limitation on Zone 3 backfill material compacted by flooding, jetting and vibration (i. e., 2-inch vs. ¾-inch), that as concerns other Zone 3 material the contract "would appear" to be clear and unambiguous in requiring the material to pass the 2-inch sieve test. Specifically, the trial court observed as follows:

"The contract read alone would appear to be clear and unambiguous except as to Zone 3 material to be compacted by flooding, jetting and vibration. All other Zone 3 material is required to meet the 2-inch size limitation."

However, the trial court did not rest its decision on the basis that the contract

was clear and unambiguous in this regard. Rather, a fifteen day trial to the court ensued with both sides offering much testimony, both expert and lay, as to the meaning of paragraph 12.2.44. Then in his memorandum opinion the trial judge concluded that "even considering the contract to be ambiguous, the evidence establishes that the defendants' [the Cities'] interpretation of paragraph 12.2.44 was and is correct." Alternatively, the trial court also held that in connection with this particular dispute MGT had not made a timely and proper protest as required by the contract and that the Cities had not waived the protest requirement.

■ With the matter on appeal in this posture, we choose to uphold the action of the trial court on the ground that the record as made upon trial supports the holding of the trial court that the interpretation argued for by the Cities is the correct one. In other words, we, like the trial court, will assume ambiguity, which we parenthetically observe is a somewhat doubtful assumption. As indicated, there was much extrinsic evidence offered concerning paragraph 12.2.44 both by MGT, on one hand, and by the Cities on the other. Indeed, some 20 persons testified and portions of 11 depositions were read into the record with the transcript of the proceedings now comprising some 2,500 pages. Needless to say, there was a conflict in this evidence. Our study of the record convinces us, however, that there is evidence to support the trial court's resolution of this phase of the controversy. Certainly the testimony of the witnesses Blair, Campbell and Proudfit, all called by the Cities, to the effect that the contract imposed a 2-inch limitation on Zone 3 backfill is in itself sufficient to support the determination of the trial court.

■ As concerns the role of a trial court sitting in a case of this nature without a jury, we recognize the general rule that the determination as to whether a contract is ambiguous is a question of law for the court. Tennessee Consolidated Coal Co. v. United Mine Workers of America, 416 F.2d 1192 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256. And the mere fact that the parties to the contract disagree on the construction to be given it does not necessarily establish a case of ambiguity. Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248 (7th Cir. 1949). However, once it has been determined that an ambiguity exists, and where the construction to be given a contract depends upon extrinsic facts and circumstances, then the terms of the contract are generally issues of fact—not law—and as such are to be determined in the same manner as other disputed factual issues, i. e., by either a jury or, as in the instant case, by the trial court sitting without a jury. Etting v. Bank of United States, 11 Wheat. 59, 24 U.S. 59, 6 L.Ed. 419 (1826); Tennessee Consolidated Coal Co., *supra;* Eastmount Construction Co. v. Transport Manufacturing & Equipment Co., 301 F.2d 34 (8th Cir. 1962); Steele v. McCargo, 260 F.2d 753 (8th Cir. 1958). In this regard the instant case would appear to be well within the rule of Halsey v. Darling, 13 Colo. 1, 21 P. 913 (1889), where it was held that when a defendant introduces a written contract which plaintiff is allowed to explain and modify by parol evidence without objection, it is for the jury to determine what the contract is. And thereafter on appeal a trial court's findings on a matter of this nature are not to be overturned if there be supporting evidence. In the instant case there is such supporting evidence and accordingly the trial court's determination is not to be disturbed.

## II. LAMBERT'S MEADOW

MGT based its claim as concerns Lambert's Meadow on alternative grounds: (1) Misrepresentation by the Cities and Bechtel in the contract and its supporting documents as to the subsurface conditions in Lambert's Meadow; and (2) the contract provisions relating to changed conditions which provided that under certain circumstances an "equitable adjustment" in contract price should be made.

■ As concerns the first ground, the trial court found that there was no misrepresentation in the contract or otherwise as to the subsurface conditions in Lambert's Meadow and this finding is amply supported by the record. In this general regard the trial court noted that the contract called for pre-bid inspection by MGT and found that MGT had relied at least in part on the visual inspections made by its inspectors of the premises in question. We find no error here.

As concerns the provisions of the contract relating to the so-called changed conditions, as indicated, under certain circumstances MGT might well be entitled to an upward "equitable adjustment." However, the contract required that before the changed condition be disturbed MGT promptly give written notice to Bechtel, as the engineer on the project, of the "unknown physical condition" encountered. Certainly the evidence supports the trial court's finding that MGT did not comply with the requirement of prompt written notice of the difficulty thus encountered.

■ The trial court additionally found that the Cities had not by their actions waived the requirement of prompt written notice in the event of changed conditions. As the work was drawing to completion, MGT admittedly did make a written claim for additional compensation for extra work necessitated in excavating the trench in the Lambert's Meadow area. In this general connection it should be noted that the contract provided that even though written notice of claimed changed conditions was not promptly given, the Cities nonetheless could, if they determined that the facts justified such, "consider and adjust any such claim asserted before the final date of settlement of the contract." The claim relating to Lambert's Meadow was but one of several claims thus submitted, with certain claims being subsequently withdrawn by MGT, and with other claims being settled. It was in this general setting that first Bechtel, and then the Cities, denied MGT's claim for additional compensation for the extra work allegedly necessitated by the changed conditions encountered in the Lambert's Meadow area. The denial of this particular claim was *not* based on MGT's failure to give notice in the manner required by the contract, but was made on the basis that though the excavation may have been difficult, under the circumstances it should have been anticipated by MGT. It is the position of MGT that the Cities and Bechtel having denied this claim "on the merits," they have thereby waived the failure of MGT to give prompt written notice of the changed conditions and cannot thereafter assert the matter by way of defense when subsequently sued. We agree.

■ We recognize that the issue of waiver, involving as it does the question of intent, is usually one of fact, not law. J. T. Majors & Son, Inc. v. Lippert Bros., Inc., 263 F.2d 650 (10th Cir. 1958). Equally well settled, particularly in Colorado, is the rule that where one has refused to comply with a contract on one ground, other possible grounds for refusal are thereby waived. Bicknell v. Vollmuth, 112 Colo. 207, 147 P.2d 478 (1944); Federal Life Ins. Co. v. Wells, 98 Colo. 455, 56 P.2d 936 (1936); Boaz v. Order of Commercial Travelers of America, 69 Colo. 44, 168 P. 1178 (1917); Hartford Fire Ins. Co. v. Hammond, 41 Colo. 323, 92 P. 686 (1907); and Montelius v. Atherton, 6 Colo. 224 (1882).

The pertinent facts concerning waiver, which have been set out above, are undisputed; hence, the issue of waiver poses a question of law, not one of fact. On the basis of the authorities above cited, we conclude that the trial court erred in its brief finding that "the claim [of waiver] is not supported by the evidence." On the contrary, in our view the evidence requires as a matter of law a determination that the Cities have by their actions waived the requirement of the contract that MGT give prompt written notice of any changed conditions.

■ The trial court, as already mentioned, "assumed" that there was a changed condition, but made no "find-

ing" to that effect. MGT argues here that we should hold that as a matter of law there were such changed conditions, and remand the matter to the trial court solely for a determination of its damages. We do not regard the issue as to whether there was a changed condition within the meaning of the contract to be one of law. Rather, we believe it to be a question of fact to be resolved by the trier of the facts, not by us. Accordingly, this phase of the controversy must under the circumstances be remanded to the trial court for a determination by it as to the existence or non-existence of changed conditions and for such further proceedings, if any, as its determination in this regard might entail.

The judgment dismissing MGT's claim for extra compensation in connection with the allegedly changed conditions it encountered in Lambert's Meadow is reversed and this phase of the controversy only is remanded for further proceedings consonant with the views herein expressed. The judgment of the trial court in connection with MGT's claim in connection with Zone 3 backfill material is affirmed.