**M. S. MAJOR, d/b/a Major Livestock Company, Plaintiff-Appellee,**

v.

**A. M. BISHOP, d/b/a Bishop Cattle Co., Defendant-Appellant.**

No. 71–1433.

United States Court of Appeals, Tenth Circuit.

June 21, 1972.

Rehearing Denied Aug. 8, 1972.

Peter J. Broullire, III, Albuquerque, N. M. (Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., on the brief), for plaintiff-appellee.

Charles C. Spann, Albuquerque, N. M. (Grantham, Spann, Sanchez & Rager, Albuquerque, N. M., on the brief), for defendant-appellant.

Before SETH and McWILLIAMS, Circuit Judges, and CHRISTENSEN *, District Judge.

McWILLIAMS, Circuit Judge.

This is a contract dispute arising out of a contract for the purchase and sale

---

* Of the District of Utah, sitting by designation.

of cattle. The parties to the contract are M. S. Major, a citizen of New Mexico, doing business as the Major Livestock Company, the seller of the cattle, and A. M. Bishop, a citizen of Nebraska, doing business as the Bishop Cattle Co., the buyer of the cattle in question. The dispute concerns the weight of the cattle to be purchased under a contract dated July 3, 1969. Major asserts that the weight specifications in the written contract are "average" weights; whereas Bishop claims the contract is clear and unambiguous and requires that no steer weigh over 625 pounds and no heifer weigh over 600 pounds. Bishop refused to accept the cattle tendered him by Major on the ground that the steers thus tendered, or many of them, weighed more than 625 pounds and that the heifers thus tendered, or many of them, exceeded 600 pounds.

On this state of events, Major brought a breach of contract action against Bishop. Trial by jury was waived, and the trial court, after finding that the contract in question was ambiguous as to weight limitations, received extrinsic evidence, including evidence of custom and usage, and then found that the weight specification of 625 pounds for steers and 600 pounds for heifers meant that the *average* weight of all steers tendered need only be 625 pounds, or less, and that the *average* weight of all heifers tendered need only be 600 pounds or less. The trial court then went on to further find that Major had tendered Bishop the cattle called for by the contract, both as concerns the number of cattle and their average weight; that the tender was within the time for delivery specified in the contract; and that Bishop had breached the contract by refusing to accept delivery.

As concerns damages, the trial court found that when Bishop refused to accept delivery, Major was forced to resell the cattle in question to a third party at a loss of $8,600.48. There were several claims for relief and judgment was accordingly entered in favor of Major against Bishop in a total sum of

$36,049.86 and interest, this sum representing: (1) the loss resulting in the resale of the cattle refused by Bishop, i. e., $8,600.48; (2) $966.00 for extra feed and water for the cattle refused by Bishop; and (3) the balance due, after crediting Bishop with $16,000.00, on a prior contract between the parties, dated May 29, 1969, the net amount thus due on this separate transaction being $26,483.38.

Though brief reference to the May 29 contract will be made in order to put the matter in focus, there is no dispute as to the net amount due under that particular contract, i.e., $26,483.38. Rather, the present dispute centers exclusively on the second contract between the parties entered into on or about July 3, 1969. Both contracts, incidentally, were on a printed Livestock Contract form with blanks for appropriate entries of specific terms and provisions.

On May 29, 1969, Major and Bishop entered into a contract whereby Major agreed to sell and Bishop agreed to buy "about" 230 yearlings, "estimated" to be about 120 steers and 110 heifers, to be delivered on or about October 17, 1969. Although it apparently is not of significance, we note that in the May 3 contract no mention was made concerning the weight of either the steers or the heifers.

▮▮▮ On July 3, 1969, the same parties entered into a second and separate contract for the purchase and sale of additional yearlings. Specifically, Major agreed to sell Bishop "approx." 1100–1200 choice yearlings, "estimated" to be approximately 700–750 steers, the balance being heifers, delivery to be made between October 10 to November 10, 1969. As concerns weight, Major inserted in one of the blanks provided in the printed Livestock Contract form, in longhand, the following: "Estimated weight on yearlings 580 to 625 average." Bishop signed this contract and returned the same to Major, but inserted immediately below Major's statement as to estimated weight, also in longhand, the following: "Cattle to be native cattle,

steers not weighing over 625#; heifers not weighing over 600#." In returning the contract, as thus interlined, Bishop also sent his personal check for $16,000, as part payment, which check was cashed by Major.

The aforesaid check for $16,000 bore on its face the several longhand notations made on the printed Livestock Contract form by Major and Bishop, i.e., Major's insertion "estimated weight on yearlings 580 to 625 average," as well as Bishop's additional insert, "steers not weighing over 625#; heifers not weighing over 600#." This notation on the check was made by Bishop's wife. Before cashing the check, Major added "ave." following Bishop's weight specification so that it then read: "steers not weighing over 625#; heifers not weighing over 600# ave." On trial, Major testified that he made this addition so that the notation on the face of the check would conform to what he thought was the contract between the parties.

Around the middle of October 1969, Bishop came from Nebraska to New Mexico and at that time accepted delivery of the cattle called for by the May 29 contract. It was apparently at this juncture that a dispute first arose as to the weight specification on the cattle called for by the subsequent contract of July 3, with Bishop refusing to accept any steer weighing over 625 pounds or any heifer weighing over 600 pounds. After about one week Bishop returned to his home in Nebraska, having accepted delivery of the cattle called for by the May 29 contract but having declined to accept delivery of any cattle under the July 3 contract because of what he deemed to be a weight overage. In the succeeding few days, telegrams were exchanged by Major and Bishop, which exchanges we deem to be of no legal significance, but all to no avail, and Major later brought the present proceeding.

■ As indicated, the trial court found that there was an ambiguity in the contract "as to whether the contract required the delivery of cattle, the average weight of which could not exceed the weight specified; or whether it required that no single animal could exceed the weight specified." The trial court then went on to declare that "through resort to the customs and usages of the trade, the court resolved the ambiguity to mean that the contract required the plaintiff to tender yearling steers weighing 625 pounds average, or less, and yearling heifers weighing 600 pounds average, or less." Our study of the matter leads us to conclude that the trial court was correct in its determination that the contract was ambiguous, and that the record as made regarding custom and usage in the trade supports its finding that the contract called for average weights.

■■ A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. In other words, the contract is capable of being understood in more than one sense. Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248 (7th Cir. 1948), cert. denied, 337 U.S. 915, 69 S. Ct. 1155, 93 L.Ed. 1725 (1949). Bishop, and Major himself in the first instance, argued that the contract was clear and unambiguous, though each argued for a different meaning. The mere fact that the parties to the contract disagree on the construction to be given it does not necessarily establish a case of ambiguity. Metropolitan Paving Co. v. City of Aurora, Colorado, 449 F.2d 177 (10th Cir. 1971). However, the language inserted by both parties in the printed contract form does in our view create an ambiguity as to weight specifications in that such is reasonably susceptible of more than one meaning. As noted above, Major inserted the phrase: "Estimated weight on yearlings 580 to 625 average." Just what binding effect results from an "estimate" is perhaps a bit uncertain. Be that as it may, the balance of this particular phrase would appear to mean that the average weight on the 1100–1200 choice yearlings would be between 580 and 625 pounds. In oth-

er words, the total weight of the yearlings, divided by the number of yearlings sold, would be somewhere between 580 and 625 pounds. All of which would mean that some yearlings would in all probability weigh more than 625 pounds. It is also noted that in the insertion by Major no distinction was made as concerns weight between steers and heifers.

In this setting, without striking out any portion of the insertion made by Major, Bishop simply added some words of his own, namely, that the cattle should be native cattle, "steers not weighing over 625#; heifers not weighing over 600#." This addition obviously draws a distinction between steers and heifers as concerns weight, and it could well be argued that this was the primary import of such words of limitation. In any event, we agree with the trial court that the words thus added do not clearly and unambiguously declare that no single steer could exceed 625 pounds, and that no single heifer exceed 600 pounds. On the contrary, it could still be argued with considerable force that the words used by Bishop, while distinguishing between steers and heifers, did not rule out the averaging concept. All of which demonstrates, we think, that there was an ambiguity concerning weight specifications in the July 3 contract. Whether a given contract is ambiguous is generally a question of law to be resolved by the trial court, in the first instance. Metropolitan Paving Co., *supra*. And we agree with the trial court's determination that an ambiguity does exist in the July 3 contract.

■■ Having found an ambiguity to exist, the trial court permitted the introduction of extrinsic evidence to assist in determining the meaning to be given the contract, much of such evidence relating to custom and usage in the trade. It is proper for a trial court, having found an ambiguity to exist, to consider extrinsic evidence in determining the meaning to be given. Jernigan v. New Amsterdam Casualty Co., 69 N.M. 336, 367 P.2d 519 (1961). And New Mexico law permits a consideration under the circumstances of this case of custom and usage in the trade. Section 50A-1-205, N.M.S.A. (1971 Supp.). The clear import of such line of testimony was that references to weight in a contract calling for the delivery of some 1100-1200 head of cattle, in the absence of express words to the contrary, mean average weight. Accordingly, we find ample evidence to support the trial court's finding that by virtue of custom and usage in the trade the references in the July 3 contract mean average weight. And Bishop's suggestion that he himself knew nothing about the custom and usage in the trade in New Mexico is unavailing if for no other reason than the fact that his agent, Vilas Burry, did know of such custom and usage in the trade and so testified upon trial. Notice to the agent is generally notice to the principal. Johnson v. Sowell, 80 N.M. 677, 459 P.2d 839 (1969), and Perez v. Velasquez, 80 N.M. 319, 455 P.2d 185 (1969).

■ Bishop also argues that even accepting the average weight concept, the trial court erred in finding that Major had made a valid tender within the terms of the contract. As mentioned above, the trial court found that Major did make a timely tender to either Bishop personally, or his agent, one Vilas Burry, of "various cattle which fulfilled the terms of the contract." Bishop, incidentally, was not himself personally present in New Mexico when the contract negotiations were going on, and during most of the time a Denver cattle buyer, Vilas Burry, was Bishop's on-the-scene agent and representative. Also, in making delivery to Bishop, Major had to first purchase the cattle called for by the two contracts from various New Mexico ranchers, and then assemble the cattle thus bought by him in pens in Magdelena, New Mexico, for ultimate delivery to Bishop. Accordingly, numerous invoices and the like were introduced to show the various purchases made by Major in preparation for delivery of the cattle covered by the two contracts. As is not surprising, under such circumstance the evidence as to

Major's ability to perform in accord with the terms of the contract is not crystal clear and at times is admittedly a bit difficult to follow. But we are convinced that the record taken as a whole does support the trial court's finding that Major was "ready, willing and able to perform in accordance with the terms of the contract," and that Bishop breached the contract without justification. Certainly, the impact of the total record is that if the dispute over the weight of the cattle had not developed, Bishop would have returned to Nebraska with 1100–1200 choice yearlings. Similarly, the record supports the trial court's further finding that the cattle in question were resold at a loss of $8,600.-48.

Judgment affirmed.