## BLUE ROCK INDUSTRIES

v.

## RAYMOND INTERNATIONAL, INC.

Supreme Judicial Court of Maine.

Sept. 11, 1974.

---

Bennett & Schwarz, P. A., by Herbert H. Bennett, John N. Kelly, Portland, for plaintiff.

McLean, Southard & Hunt, by George H. Hunt, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

DUFRESNE, Chief Justice.

■ This is an action brought by the plaintiff, Blue Rock Industries (hereinafter Blue Rock), to recover $128,891.61 allegedly owed by the defendant for a quantity of sand which Blue Rock sold and delivered to the defendant. In the Court below the parties tried the case, at the outset, before a jury; during the course of the trial, however, it was agreed that the jury would be dismissed and the case tried by the Court sitting jury-waived. It was further agreed that neither party would request conclusions of law nor findings of fact and the presiding Justice would simply make a general finding for either party.[1] The Justice decided for Blue Rock in the amount of $114,231.27 and the defendant appeals. We deny the appeal.

Blue Rock is a Maine Corporation which, among other things, sells sand to contractors and subcontractors for use in road construction. Raymond International, Inc. (hereinafter Raymond), the defendant, is a foreign corporation properly doing business in Maine. One of Raymond's activities involves the construction of roads or highways. Raymond was interested in obtaining a subcontract for certain work on a highway being built in Maine. The job called for a quantity of sand. In order to prepare its bid, Raymond asked Blue Rock for the price at which Blue Rock would sell sand.[2] In a letter dated August

1. Our summary of the agreement reached by the parties should not be viewed as suggesting that the parties by agreement may divest the presiding Justice of his authority to state findings of fact and conclusions of law, *sua sponte*, under M.R.Civ.P., Rule 52(a). See, Jacobs v. Boomer, 1970, Me., 267 A.2d 376, 379.

2. Some of the initial negotiations and purchases were transacted between Raymond and a Blue Rock subsidiary referred to in the record as Cumberland Sand & Gravel Co., Inc. At some unidentified point during the dealings between the parties, the subsidiary apparently merged with the parent company. There is no argument that Blue Rock is an improper

21, 1969, Blue Rock responded as follows:

"Our price would be as follows for truck measured sand delivered to the job site as you require:

$2.75 per cubic yard delivered to the north side of the project.

$2.60 per cubic yard delivered to the south side of the project."

In a subsequent letter from Blue Rock to Raymond, dated August 25, 1969, it is noted that a Raymond representative had orally called Blue Rock's attention to the fact that the latter had inadvertently reversed its price quotations, confusing the north side with the south. The letter further states that the correct prices for delivered sand "truck measure" should be $2.75 per cubic yard for the south delivery site, and $2.60 per cubic yard for the north.

This price was subsequently negotiated downward to $2.65 per cubic yard (south) and $2.50 per cubic yard (north) and a letter from Blue Rock to Raymond dated August 29, 1969 purports to confirm an oral agreement to that affect. The letter confirming this new price retained the term "truck measure" which had been used in the prior correspondence. At this time Blue Rock was in fact supplying sand to Raymond. Raymond in turn had been accepting and paying for the sand. The record does not indicate the manner by which Raymond informed Blue Rock as to the amount of sand to be purchased or how the sand was ordered, but this is not significant, since there is no controversy surrounding the parties' earlier transactions.

The controversy concerns sand subsequently delivered, after the parties had arguably agreed to deal in terms of tons instead of the previously-used cubic yard measurement. During the initial negotiations, Blue Rock had no truck scales at the plant from which it was obtaining the sand. Scales were subsequently installed, which enabled Blue Rock to weigh its trucks and thus ascertain the exact weight of sand being sold. In conjunction with the acquisition of the scales, Blue Rock proposed to Raymond a modification of the terms of sale whereby the sand would thereafter be delivered and sold by the ton. There was evidence from which the trial Justice could find that Raymond acquiesced in the proposal.

It is not disputed that in converting to tons the parties intended that the overall amount which Raymond was to pay for the sand delivered would be the same as the price which would have been paid, had the original truck measured cubic yard basis been retained. The former price ($2.65 and $2.50 per cubic yard), therefore, had to be converted to a price per ton. In order to equate the price per ton with the price per cubic yard it was necessary to ascertain the number of tons in a cubic yard.[3] For example, if a cubic yard contained exactly 2000 pounds, one ton, then the price would be the same. If there were less than 2000 pounds in a cubic yard, then the price *per ton* would have to exceed the price per cubic yard.

Blue Rock produced oral evidence, disputed by Raymond, to the effect that representatives of both companies agreed to get together and weigh some truckloads of sand. They would then divide the weight of the sand in the truck by the truck's as-

party to this action or that any necessary party has not been joined. Nor is there any issue as to the authority of one company to bind the other, and therefore, for convenience of reference, we shall refer only to Blue Rock throughout this opinion.

Similarly, it will avoid unnecessary confusion if, in describing the dealings between the parties, we refer only to the corporate litigants without identifying the various employees through whom the corporations trans-

acted business. There is no issue as to the authority of any agent to bind his principal.

3. As will hereinafter appear, there is a distinction to be drawn between cubic yards and cubic yards "truck measure." The reference in the text to the number of tons in a cubic yard is merely to show that a conversion was necessary to equate yards with tons. The words "yards" or "cubic yards" in this specific context are used to indicate truck measured cubic yards.

signed cubic yard capacity and thereby obtain a conversion factor indicating the number of pounds in a cubic yard. When the Raymond representative failed to arrive for the weighing, the Blue Rock representative carried out the experiment himself. The results were related in a letter from Blue Rock to Raymond dated October 6, 1969. The pertinent paragraph of the letter states:

"We have weighed several of your days' shipments and find a factor of 2300 pounds per yard. On this basis the new price by the ton will be as follows:

South Side = $2.38 per ton delivered

North Side = $2.27 per ton delivered."

On October 15, 1969, Raymond responded by sending Blue Rock a purchase order for "approx." 100,000 cubic yards of sand. Instead of stating the price in tons as quoted by Blue Rock, Raymond's purchase order read as follows:

"Prices shall be:

a. Two dollars sixty-five cents per cubic yard ($2.65/cy) truck measure for material delivered south of Fore River.

b. Two dollars fifty cents per cubic yard ($2.50/cy) truck measure for material delivered north of Fore River. You shall supply delivery tickets with each truck delivery which shall show delivered and tare weights of trucks. Weight of material per cubic yard for payment purposes shall be determined by an independent laboratory from samples of material supplied by ourselves."

Blue Rock responded by letter dated November 3, 1969. The letter initially thanked Raymond for the purchase order. It went on to point out "a couple of errors." Only error number one is relevant to the present case, and concerning this the letter stated:

"1. Our present price of $2.38 and $2.27 per ton was based on the 2300 pound factor and our original [4] quote of $2.75 and $2.60 per cubic yard. (see our letters of August 25, 29 and October 6.) The price correctly should read *$2.30* per ton South Side and *$2.17* per ton North Side."

Raymond did not immediately respond in writing to this letter. However, Raymond did thereafter accept and pay for sand the price of which was computed in accordance with the 2300 pound factor (i. e. $2.30 and $2.17 per ton).

In June of 1970 Raymond forwarded to Blue Rock a document referred to in the record as a "follow-up purchase order." Under the heading "Prices shall be:" the order reads as follows:

a. Two dollars and thirty cents per ton ($2.30)–(Ton) truck measure for material delivered south of the Fore River.

b. Two dollars and seventeen cents per ton ($2.17)–(Ton) truck measure for material delivered north of Fore River."

It may be noted at this point that these prices stated by Raymond were the same as those quoted by Blue Rock in its letter of November 3, 1969. That letter had stated that the quoted prices were based on the 2300 pound factor. Raymond's follow-up purchase order made no mention of its earlier purchase order which had stated that the weight of sand for payment purposes would be determined by an independent laboratory.

Blue Rock's records indicate that Raymond continued to accept, and pay for, the sand delivered and billed by the ton until November 3, 1970. On that date Raymond was credited with a payment of $65,555.92, which left an outstanding balance of $116,337.15. The final entry on the account is dated November 17, 1970, at which time Raymond's outstanding balance was

4. As noted above the prices originally quoted had been negotiated downward to $2.65 and $2.50.

shown to be $128,891.61, the amount sought by Blue Rock in the present action.

In defense of the claim, Raymond contends that Blue Rock's 2300 pound conversion factor is "incorrect," and that as a result of this error Raymond's indebtedness has been greatly inflated.

### I.

Much of the confusion surrounding this appeal results from the fact that the parties have only casually referred to the Maine Uniform Commercial Code, 11 M. R.S.A. § 1–101 et seq., which governs this case. Raymond in its brief has cited section 2–319 of the Code [5] which, *inter alia*, discusses the meaning of the term "F.O.B." Here, however, there is no dispute as to the meaning of that term and it has no relevance to the issues presented. Blue Rock has cited the Uniform Commercial Code Comment to section 2–207 dealing with Raymond's duty to object to the terms proposed by Blue Rock, and section 2–208(1) dealing with the relevance of a course of performance in determining the meaning of an agreement. Although these cursory references to the Code are of little assistance in resolving the present dispute, they do at least indicate some awareness of the Code's applicability and run counter to any argument the other way.

■ Under section 2–102, Article 2 of the Code is made applicable to "transactions in goods." Section 2–105 broadly defines "goods" as:

"all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. 'Goods' also includes the unborn young of ani-

mals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 2–107)."

This definition is broad enough to include a contract for the sale of sand to be delivered to the buyer. See, Jeffery v. Starr, 1933, 45 Ohio App. 116, 186 N.E. 319; American Sand & Gravel, Inc. v. Clark & Fray Const. Co., 1963, 2 Conn.Cir. 284, 198 A.2d 68.

### II.

■ In attempting to resolve this dispute we are initially faced with the issue, whether the decision in the Court below was one of fact or one of law. Blue Rock urges that the case presents a factual question the resolution of which may not be upset on appeal unless shown to be "clearly erroneous" under M.R.Civ.P., Rule 52(a). Raymond, on the other hand, contends that the facts are "undisputed" (citing Allstate Ins. Co. v. Government Employees Ins. Co., 1970, Me., 263 A.2d 78) or, alternatively, that the case requires only the Court interpret an unambiguous written contract, a function which has always been deemed a question of law. On the facts of this case, neither argument advanced by the defendant is applicable.

■ We agree that the construction of an unambiguous written contract is a question of law for the Court. *E. g.*, Hoyt v. Tapley, 1922, 121 Me. 239, 116 A. 559; Harmon v. Roessel, 1957, 153 Me. 296, 137 A.2d 374; Daley v. J. F. White Contracting Co., 1964, 347 Mass. 285, 197 N.E.2d 699. But, in Wiggin v. Sanborn, 1965, 161 Me. 175, 210 A.2d 38, we said:

"*A written condition will present a jury question* only *when* the language employed is ambiguous or *there is* either *an*

---

5. The statute of frauds, 11 M.R.S.A. § 2–201, has not been raised as an affirmative defense under M.R.Civ.P., Rule 8(c). Since the issue has not been raised by the pleadings or in argument, it is unnecessary to consider the

sufficiency of the writings and whether under the provisions of section 2–201(3)(c) the contract would still be enforceable with respect to the sand received and accepted by Raymond.

*exchange of correspondence* or an oral conversation *of such a nature as to create doubt as to what was intended or should reasonably have been understood."* (Emphasis added).

Here, however, neither the writings nor the actions of the parties are completely free of ambiguity. For example, when the parties to this contract chose to buy and sell sand in terms of "truck measure," they elected to employ a phrase the meaning of which is not readily definable. This is their prerogative and their own indifference to the uncertainty thus created does not preclude the existence of a contract; nor does it render the contract incapable of enforcement. 3A Corbin, Contracts, § 558, at 251–253 (1960). It does, however, necessitate a greater reliance on their own course of performance and practical construction in interpreting the agreement. *Id.* Under such circumstances, the Court is interpreting, not a formal and precise legal document, but rather, a series of letters commercial in nature in connection with other facts and circumstances which themselves are not wholly unequivocal. In such cases the existence of the terms of the contract becomes a question for the trier of fact. Construction Aggregates Corp. v. Hewitt-Robins, Inc., 1968, 7 Cir., 404 F.2d 505, 509, cert. denied, 395 U.S. 921, 89 S. Ct. 1774, 23 L.Ed.2d 238; Jaeco Pump Co. v. Inject-O-Meter Mfg. Co., 1972, 10 Cir., 467 F.2d 317.

In a very similar case, the Court of Appeals for the Fifth Circuit has held it to be a question of fact whether the parties to a contract intended that a stated price for crushed stone was to be for cubic yards of stone *packed and measured in place,* or whether the stated price was only to be for loose, truck measured cubic yards of stone. Edward E. Morgan Co. v. United States, 1956, 5 Cir., 230 F.2d 896, cert. denied, 351 U.S. 965, 76 S.Ct. 1030, 100 L.Ed. 1485.

Nor can it be said in the context of this case that the facts are undisputed as Raymond contends. While it is true that there are some matters over which there is no disagreement, it is equally true that other matters are very much disputed. Blue Rock, for example, contends that there was an oral agreement that both parties would abide by the results obtained by the scheduled weighing experiment. Raymond denies such an agreement. Moreover, the parties are completely at odds as to the meaning of the ambiguous phrase "truck measure," a phrase which influences and dominates the entire transaction. Thus, there is a definite evidentiary conflict. See, Jacobs v. Boomer, 1970, Me., 267 A.2d 376.

In case such as this, where the parties have chosen to proceed without a jury and where no findings of fact have been made, we must proceed on the assumption that the trial Justice found for the appellee on all factual issues necessarily involved in the decision. Jacobs v. Boomer, supra, Sanfacon v. Gagnon, 1933, 132 Me. 111, 167 A. 695. Consistent with familiar principles, the findings thus assumed to have been made will not be set aside by this Court unless shown to be clearly erroneous. Jacobs v. Boomer, supra.

### III. "TRUCK MEASURE"

The conflict in this case is essentially one of price. The disputed conversion factor and the meaning of the term "truck measure" are subsidiary points having a direct bearing on the ultimate question of the price to be paid for the sand sold by Blue Rock to Raymond.

The thrust of Raymond's argument is not that Blue Rock in fact delivered less sand than Blue Rock claims to have delivered. The sand was delivered by the ton and there is no dispute as to the amount of tons actually delivered. The essence of Raymond's argument is that the price charged per ton greatly exceeds the price which should have been charged, notwithstanding Raymond's ostensible acquiescence in the allegedly incorrect charges.

As already noted, it is agreed that the total price to be paid by Raymond for all the sand delivered was to be the same, whether the sand was measured in tons or in cubic yards "truck measure." From this premise, Raymond agrues, initially, that the Justice below erred as a matter of law in failing to give the words "truck measure" what Raymond contends to be their "plain, ordinary, and generally accepted meaning." It is Raymond's position that the words should be construed to call for nothing less than a standard cubic yard of precisely 27 cubic feet, measured *in* the truck. Blue Rock's position is that a cubic yard truck measure may or may not be the same as a standard cubic yard, because the phrase "truck measure" indicates that the quantity of sand is to be measured *by* the truck itself. According to Blue Rock's evidence, the term depends upon the hypothetical or assigned capacity of a given truck and the extent to which that truck appears to be fully loaded. Thus, a truck having a capacity of ten cubic yards and seemingly "loaded to the hilt" would be considered to be carrying ten cubic yards, truck measure. Whether it actually contained exactly ten cubic yards was never ascertained and, as Blue Rock in effect argues, the parties by using the phrase "truck measure" agreed to sacrifice such precision for what they deemed to be a more expedient approximation.

The significance of ascertaining the meaning of the phrase lies in the fact that the price per ton was to be equated with the price per cubic yard "truck measure." If the words "truck measure" signify something other than a standard cubic yard, then it would be inappropriate to attempt to ascertain the number of pounds in a standard cubic yard. The only proper way to equate the price per ton with the already established price per cubic yard truck measure would be to attempt to ascertain the number of pounds in a truck measured cubic yard.

In the case at bar there was considerable evidence from which the trier of fact could conclude that the proper meaning of the phrase was that suggested by Blue Rock. The phrase itself is reasonably and fairly capable of different constructions, and it is, therefore, ambiguous. See Major v. Bishop, 1972, 10 Cir., 462 F.2d 1277.

In addition to an examination of the express terms of an agreement, the Code also encourages resort to course of performance (11 M.R.S.A. § 2–208), course of dealing (11 M.R.S.A. § 1–205), and usage of trade (11 M.R.S.A. § 1–205). See, Major v. Bishop, supra; Jaeco Pump Co. v. Inject-O-Meter Mfg. Co., 1972, 10 Cir., 467 F.2d 317; Oskey Gasoline and Oil Co., Inc. v. OKC Refining Inc., 1973, D.Minn., 364 F. Supp. 1137; Associated Hardware Supply Co. v. Big Wheel Distrib. Co., 1965, W.D. Pa., 236 F.Supp. 879, vacated and remanded on other grounds, 355 F.2d 114.

Here, the writings of the parties fail to supply any definition of the term "truck measure." However, one of Blue Rock's witnesses testified that he and a representative of Raymond had orally agreed to establish a conversion factor by dividing the weight of the sand in the trucks by the *assigned* capacity of the trucks. The Raymond representative denies having any agreement, but the trial Justice was free to disregard the denial. An agreement to this effect could be viewed as strong evidence in favor of Blue Rock's interpretation. If Raymond was willing to divide by the assigned capacity of the truck, without regard to the exact volume of material in the truck, it would be inconsistent for Raymond now to argue that it had always interpreted "truck measure" to mean actual, and not average, volume. Although this would suffice to sustain the finding assumed to have been made by the Justice below, we need not rest our decision with respect to the present argument on this evidence alone.

The same Raymond witness further explained his understanding of "truck measure" on direct examination by counsel for

Raymond. The pertinent excerpt from the transcript contains the following questions and answers:

"A. My interpretation of that would be measured when delivered, that is the way I believed it to be.

Q. Measured how?

A. By volume. By checking the height of the load to see that it is *pretty much in conformance with the designated volume capacity* of the truck body.

Q. In other words, *by actual measurement?*

A. Well, *you couldn't actually measure each and every one of them*, but you could tell whether a load was short or not." (Emphasis added).

Elsewhere in the record, where the witness insisted that a cubic yard truck measure meant simply 27 cubic feet, he elaborated on he phrase in terms which conform precisely with Blue Rock's interpretation:

"Truck measured cubic yard would be pre-determined as to how many cubic yards of volume are contained on the truck and if that truck is loaded to the hilt, to full capacity, whether it be five cubic yards or ten cubic yards, then if the truck were full, we would know that we have five cubic yards or ten cubic yards. You have designations on the chart of the truck with various numbers, six yards or ten yards or twelve yards, etc. and I can't see any difference in 2700-cubic feet on a truck or 27 cubic feet in the yard. A yard is a yard, to me."

It is not disputed that Raymond accepted and paid for a large quantity of sand the price of which had been computed in accordance with Blue Rock's understanding of the disputed phrase. The contract provided for repeated opportunities for performance by both parties, yet Raymond, with knowledge of Blue Rock's formula for dividing by the *assigned* capacity of the truck, never objected to this formula and never insisted that the weight of the sand should be divided only by the actual amount of sand in the truck. Even when Raymond mentioned an independent laboratory to determine the weight per cubic yard, it did not object to Blue Rock's formula, but only to the identity of the party who was to apply the formula. Subsequently, when Raymond issued its "followup" order, it expressly affirmed Blue Rock's prices computed in accordance with Blue Rock's formula, and implicitly abandoned even the suggestion of an independent laboratory.

█ Under these circumstances, Raymond's course of performance could well be viewed as complete acquiescence in Blue Rock's interpretation of the phrase "truck measure." Oskey Gasoline and Oil Co., Inc. v. OKC Refining Inc., supra; Associated Hardware Supply Co. v. Big Wheel Distrib. Co., supra. There was additional evidence, which could be viewed as showing a usage of trade (11 M.R.S.A. § 1–205(2)), to the effect that the average rather than exact quantity resulting from this definition of "truck measure" was a commonly accepted measurement in the trade. Such evidence may properly be considered in interpreting the meaning of the words used by the parties. Major v. Bishop, supra; Edward E. Morgan Co. v. United States, supra (usage admitted to define truck measure).

█ Raymond has placed considerable emphasis on the fact that this interpretation of the phrase necessarily injects an element of uncertainty into the dealings between the parties. It is suggested that a more exact measurement could have been employed. We fully agree with this observation and the subsequent conversion to *tons* supports the argument that a more precise measurement might have been employed. This, however, does not relieve Raymond from liability. Section 2–204 of the Code expressly sanctions agreements in which one or more terms are left open as

long as there is "a reasonably certain basis for giving an appropriate remedy," and the parties have intended to make a contract. The parties, if they wish, may deal on the basis of average measurements without rendering the agreement unenforceable. See, Major v. Bishop, supra. Under the Code, they may fail to agree on the price and still have a valid contract. 11 M.R.S. A. § 2–305; see, e. g., Morris Co. v. Athas, 1972, 221 Pa.Super. 239, 289 A.2d 758. The fact that the parties might have adopted a better standard is immaterial.

"[T]he law gives effect to the contract recognized by the parties in their course of dealing [and course of performance], regardless of other provisions which the parties might have adopted during their negotiations if they had seen fit to do so." Associated Hardware Supply Co. v. Big Wheel Distrib. Co., supra, 236 F.Supp. at 882.

## IV. CONVERSION FACTOR

Raymond also alleges several areas of error in connection with the conversion factor which it contends the Court applied. Raymond assumes that the trial Justice applied a factor of 2300 pounds to establish the price and compute damages. It is argued that this was error. It is also argued that the Justice erred in not ruling that the contract called for an independent laboratory to determine the conversion factor, and in rejecting several alternative conversion factors offered by Raymond. Raymond further contends that the Justice erred in refusing to grant a motion for a new trial on the grounds that the damages were excessive. Blue Rock, on the other hand, defends the conversion factor of 2300 pounds as not being clearly erroneous, relying on the correspondence between the parties and Raymond's course of performance in paying for sand delivered over a period of time while Raymond knew that the prices had been established with reference to this factor.

If the presiding Justice had in fact computed the damages in accordance with a price based on the 2300 pound factor, we would not be inclined to say this was clearly erroneous. From the correspondence alone, the Justice could have found that by June of 1970 the parties had clearly agreed on a price per ton which incorporated the 2300 pound factor.

The problem here, however, is that both parties have wrongly assumed that a factor of 2300 pounds was used. Had the Justice applied that factor, then the prices would have been as quoted by Blue Rock ($2.30 and $2.17 per ton) and the damages would have been in the amount of $128,891.61 as alleged by Blue Rock. The Justice's finding was in the amount of $114,231.27, which represents a difference of $14,660.-34.

An examination of the record reveals the reason for the discrepancy and clearly indicates that the trial Justice computed damages in accordance with a price based on a conversion factor of 2374 pounds. During cross-examination of the Blue Rock representative who had calculated the 2300 pound factor, counsel for Raymond brought out several errors which the witness had made in his computation. The witness had computed the 2300 pound conversion factor from a sample consisting of thirteen trucks, and, in dividing the weight of the sand in these trucks by their assigned cubic yard capacity, the witness had divided incorrectly on ten occasions. A correct computation of the figures would have given a rounded figure of 2374 which, when applied to the total quantity of sand delivered, would have resulted in Raymond owing $14,660.34 less than the amount claimed by Blue Rock. This is the exact amount by which the trial Justice reduced Blue Rock's claim for damages. The Justice's action can only mean that the conversion factor he used to compute dam-

ages was in fact 2374, not 2300.[6] The question remaining is whether the use of this figure was error prejudicial to the defendant.[7]

Raymond argues that the Court could have adopted any one of five other factors. Although Raymond does refer to a sixth factor, lower than the others and said by

6. In their briefs, the parties have based their arguments on the premise that a 2300 pound factor was used. At oral argument counsel for both parties indicated an awareness of the adjustment made by the trial Justice to correct the error in computation, but neither has questioned the propriety of the Justice making such a correction, and the legal effect of the miscalculation with respect to the contract has not been discussed. See, note 7, *infra*.

7. Blue Rock has not appealed from the decision below and we are, therefore, not called upon to decide whether the Justice erred in not applying the prices computed in accordance with the 2300 pound factor. If error, the error was beneficial to the appellant, since application of the 2300 pound factor would have increased the damages. Accordingly, the error would not aid Raymond on this appeal. See, Resource Engineering, Inc. v. Siler, 1972, 94 Idaho 935, 500 P.2d 836, at 841; Sylvia Coal Co. v. Mercury Coal & Coke Co., 1967, 151 W.Va. 818, 156 S.E. 2d 1.

The evidence clearly indicates that the presiding Justice could have found an agreement to pay a specified price, although that price incorporated an antecedent error of computation. Had he done so, the issue would have been raised as to whether such a mistake nullifies the apparent agreement of the parties to buy and sell at the stated prices.

The Code does not purport to change existing law concerning the doctrine of mistake in contract formation. 11 M.R.S.A., § 1–103. It is of course a fundamental principle of law that the minds of the parties must meet, and, if both sides have entered into a contract under an actual and honest mutual misunderstanding respecting material facts, it is clear that, notwithstanding the appearance of a contract in fact, there is no contract in law. Clark v. Stetson, 1916, 115 Me. 72, 97 A. 273. In the absence of fraudulent or other inequitable conduct, relief on the equity side of the court was available only where the mistake was mutual and only then could the contract be corrected. Andrews v. Andrews, 1889, 81 Me. 337, 17 A. 166. A unilateral mistake may be ground for rescinding a contract, but it cannot justify the alteration of its terms. Kennie v. City of Westbrook, 1969, Me., 254 A.2d 39; Hudson Structural Steel Company v. Smith & Rumery Co., 1912, 110 Me. 123, 85 A. 384. A mistake of fact is said to exist "when some fact which really exists is un-

known, or some nonexistent fact is supposed to exist." Crawford's Case, 1928, 127 Me. 374, 143 A. 464; Norton v. Marden, 1838, 15 Me. 45, 47.

In the present case it might have been argued on behalf of Blue Rock that a specified price was stated by one party and accepted by the other, and that there was, therefore, a meeting of the minds as to price, notwithstanding the antecedent error of computation. See, 3 A Corbin, Contracts, § 609, at 678–679 (1960). Such an argument would be relevant only to defend a finding which the trial Justice obviously declined to make. On the facts of this case at least two views of the evidence may be taken. First, it may be said that there was an agreement to use prices of $2.30 and $2.17 per ton, the prices which incorporated the miscalculation. It may also be said, however, that the parties had agreed to use whatever price accurately reflected the relationship between tons and cubic yards truck measure. The situation is analogous to that presented in Willard v. Randall, 1876, 65 Me. 81. In that case, the plaintiff argued that the defendant had agreed to sell at "cost," and the defendant argued that the agreement was to sell at a specified price, erroneously represented to be the Seller's cost. The Court there stated that "a sale for a fixed price and definite consideration, binds the parties at such price, although the sum paid was supposed to be the cost price, when it was not. In the one case, the supposed 'cost' merely induces a contract to be made. In the other, the real 'cost' becomes a material part and condition of the contract itself." 65 Me. at 86. In *Willard*, the jury found an agreement to sell at cost and awarded the buyer damages to the extent that the price charged exceeded "cost." In the instant case, the fact finder interpreted the agreement to be one to sell tons of sand at a price which would be equivalent to a previously established price per cubic yard truck measure. The theory that the contract called for a specified price per ton was implicitly rejected, and the view taken by the trial Justice conforms with that which the parties agree was always their true intent. The effect of the miscalculation on the apparent agreement to use specific prices thus becomes immaterial, since no such agreement was found to exist. Neither party can persuasively complain that the trial Justice was unwarranted in reaching a decision which effectively carried out the conceded intent of the parties.

Raymond to be the lowest which the Court "should have considered," Raymond discounts this factor on the theory that it fails to consider moisture content. The five remaining factors range from 2800 to 2897, and although Raymond concedes that the Court could properly have adopted any one of these, Raymond most strongly suggests the 2897 factor, as this was one of the factors obtained by the independent laboratory subsequently hired by Raymond. It is Raymond's position that the parties had agreed that the "correct" conversion factor was to be calculated by an independent laboratory.

Raymond's position is unacceptable for several reasons. As we have already held in our discussion of the term "truck measure," a truck measured cubic yard was intended to denote something other than a standard cubic yard. All of the factors submitted by Raymond purport to show the number of pounds in a standard cubic yard. As such, these factors had no probative value.

▮▮▮▮ The conversion factor calculated by the independent laboratory could have been rejected for the same reason. More importantly, however, the trial Justice would have been fully warranted in rejecting Raymond's argument that the contract called for an independent laboratory. Raymond bases this argument on its purchase order of October 15, 1969 and Blue Rock's responsive letter of November 3, 1969. Raymond contends that the purchase order was an offer and the response an acceptance, because the response thanked Raymond for the order and did not expressly object to the language of the offer which referred to an independent testing laboratory.

Raymond's reading of the evidence is, we believe, overly selective. For one thing, undue emphasis is placed on that portion of Blue Rock's response which thanked Raymond for the order. The let-

ter in question is the one which went on to point out "a couple of errors," and in discussing the errors, Blue Rock clearly indicated its reliance on the 2300 pound factor. An express reliance upon one factor would implicitly negate acceptance of another factor to be determined by a third party.

A specific answer to Raymond's argument which confines itself to these two documents, would require an analysis of the application of section 2–207 of the Code to these two evidentiary items. Raymond, however, has not cited this section and Blue Rock relies only on the comment thereto. The difficulty which other Courts have had in interpreting this section, and the divergent opinions which have resulted from the courts' attempts to apply it, attest to the fact that this is one of the most intricate provisions of the Code. See, Dorton v. Collins & Aikman Corp., 1972, 6 Cir., 453 F.2d 1161; Construction Aggregates Corp. v. Hewitt-Robins, Inc., 1968, 7 Cir., 404 F.2d 505, cert. denied, 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238; Roto-Lith, Ltd. v. F. P. Bartlett & Co., 1962, 1 Cir., 297 F.2d 497; Rite Fabrics, Inc. v. Stafford-Higgins Co., Inc., 1973, S.D.N.Y., 366 F.Supp. 1; American Parts Co., Inc. v. American Arbitration Ass'n, 1967, 8 Mich.App. 156, 154 N.W.2d 5.

In the present case, our decision need not include an extended analysis of section 2–207 and we do not feel compelled to engage in an abstract discussion thereof, especially without benefit of argument by the parties. Raymond again has viewed the evidence too selectively. Even if we were to assume, without deciding, that the two documents on which Raymond relies do reveal a contract calling for an independent laboratory, it would still be true that Raymond's subsequent conduct and follow-up purchase order amounted to a waiver of that provision. Under section 2–208(3) of the Code, a course of performance inconsistent with any term of the contract is relevant to show a waiver of that term under

section 2–209. See, Resource Engineering, Inc. v. Siler, 1972, 94 Idaho 935, 500 P.2d 836; Gulf Chemical & Metal. Corp. v. Sylvan Chem. Corp., 1973, 122 N.J.Super. 499, 300 A.2d 878, aff'd, 126 N.J.Super. 261, 314 A.2d 73; All-Year Golf, Inc. v. Products Investors Corp., 1970, 34 A.D.2d 246, 310 N.Y.S.2d 881.

Raymond's interpretation of the agreement would necessarily imply that, at the time of the transactions in question, there had been no price per ton established since no independent laboratory had then been retained. Raymond, however, continued to pay for the sand and the price paid was computed on a cost-per-ton basis. When Raymond sent its follow-up purchase order, it expressly stated that the price would be a specific amount per ton. The price was inversely proportionate to the conversion factor and by stating that "prices shall be" one price, Raymond's order necessarily negatived any theory that a third party was still to ascertain the proper conversion factor. Thus, Raymond's course of performance was completely inconsistent with what Raymond contends to have been the terms of the agreement and from this the trier of fact would certainly have been warranted in concluding that the provision for an independent laboratory had been waived, even if such a provision had once been part of the agreement. Since the presiding Justice, relying on this other evidence, could still have found a contract the terms of which were other than those urged by Raymond, it would be pointless to attempt to apply section 2–207 to the particular evidence on which Raymond relies and we therefore decline to do so.

When Raymond's suggested conversion factors are discarded from consideration, the factor of 2374 is the only one remaining which purports to show an accurate relationship between tons and cubic yards truck measure. Despite other areas of disagreement, the parties do agree that at all times they shared the intent to equate one price with the other and we are not prepared to say that the Justice was clearly wrong in using the only factor which fit the equation established by the parties. Our conclusion on this point also controls Raymond's argument that the damages were excessive. The damages were not excessive once this factor is adopted to ascertain the price of the sand admittedly delivered to, and accepted by, Raymond.

### V.

Raymond has also alleged error in the denial of two pretrial motions for continuances. Raymond's answer to the complaint was docketed on February 24, 1971 and an amended answer was docketed on March 3, 1971. More than one year later, on May 17, 1972, Raymond filed a motion for continuance which, on May 22, 1972, was denied. Notwithstanding the denial of the motion, trial was not scheduled for a date earlier than September 6, 1972 which in effect granted Raymond the requested continuance. On August 16, 1972, attorneys for both parties were notified of the September trial date and Raymond, on the following day, requested another continuance. This motion was denied and three weeks later the trial commenced as scheduled on September 6, 1972.

A request for a continuance is directed to the discretion of the presiding Justice, M.R.Civ.P., Rule 40(c), and, on appeal, the defendant can gain nothing from the denial of a requested continuance without showing an improper exercise of that discretion. Cunningham v. Long, 1926, 125 Me. 494, 135 A. 198. The record before us reveals no abuse of discretion. Nor has it been shown that the denial of the motions had any adverse prejudicial effect on the substantial rights of the appellant. M.R.Civ. P., Rule 61.

## VI.

Raymond lastly contends that "the Court erred in not seeing that both sides received equal protection from the Court against undue interruption and harassment during their testimonies, and in not conducting the trial with that degree of impartiality required of the Court for a fair, orderly, and equitable hearing." In answer to this argument it will suffice to say that our reading of the entire transcript shows no instance in which the presiding Justice unnecessarily interrupted any witness, nor does it reveal any lack of impartiality. Under the circumstances, the Justice demonstrated an extreme degree of patience.

The entry will be

Appeal denied.

All Justices concurring.