LEWISTON FIREFIGHTERS ASSOCIA-
TION, LOCAL 785, INTERNATIONAL
ASSOCIATION OF FIREFIGHTERS,
AFL–CIO, et al.

v.

CITY OF LEWISTON et al.

LOCAL 1828 OF COUNCIL 74 and Lewiston
Patrolman's Unit of Local 1828

v.

The POLICE COMMISSION OF the CITY
OF LEWISTON et al.

Supreme Judicial Court of Maine.

March 1, 1976.

Ranger, McTeague & Higbee, P. A. by Patrick N. McTeague, Brunswick, Stephen P. Sunenblick, Augusta, for plaintiffs.

Kenneth C. Young, Jr., Lewiston, Ranger, McTeague & Higbee, P. A., by Patrick N. McTeague, Brunswick, for defendants.

Before WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

This case involves appeals from two related actions decided in the Superior Court in Androscoggin County. The first, brought by the Lewistown Firefighters Association, Local 785 of the International Association of Firefighters, AFL–CIO (hereinafter the Firefighters Union) against the City of Lewiston, sought damages, injunctive relief and a declaration of rights and duties arising from the City's alleged violation of a parity pay provision in the Lewiston City Charter and in several of the collective bargaining agreements entered into by the parties since 1966.

The second action, brought by the Lewiston Patrolman's Unit of Local 1828 of the American Federation of State, Municipal and County Employees (hereinafter the Police Union) against the Firefighters Union and the City, sought a declaration that the parity pay provision in the City's Charter had been impliedly repealed by the passage of the Municipal Public Employees

Labor Relations Law (MPELRL) and, also injunctive relief against the parity pay provision's operation. Both the Police and the Firefighters Unions now appeal to this Court from decisions adverse to them.

The factual underpinnings of these two suits are somewhat entangled but may be summarized as follows.

In 1965, the Legislature enacted two pieces of legislation of particular import to members of the Lewiston Fire Department. First, it amended the Lewiston City Charter to require that firefighting personnel "[should] receive a weekly rate of compensation in an amount no less than that of equivalent officers and privates in the Lewiston Police Department." P. & S.L., 1965, ch. 33, § 1. Secondly, it enacted the Firefighters Arbitration Law (P.L.1965, ch. 396) which permitted firefighters to be represented by a labor organization and to bargain collectively with their municipal employers,[1] a privilege not yet granted to other public employees.

Firefighters in Lewiston then organized, chose the Lewiston Firefighters Association, Local 785, International Association of Firefighters, AFL–CIO, as their collective bargaining representative and entered into a series of employment contracts with the City, all of which provided, in some form or other, for parity pay between the Police and the Firefighters.

In 1969, the Legislature enacted the MPELRL (26 M.R.S.A. §§ 961–72) which extended to all municipal employees the rights to organize and bargain collectively.

On November 25, 1972, in accordance with the remedies provided by its collective bargaining agreement, the Firefighters brought a labor grievance before a Board of Arbitrators, claiming that the City had compensated its firefighters at a weekly

rate less than that of persons of equivalent rank in its police force in violation of both the City Charter and their employment contract with the City.

Before the Arbitrators had reached their decision, the Firefighters Union brought its complaint against the City, its Aldermen and the members of its Fire Commission, charging these defendants with violating the parity pay provisions of both the City Charter and their employment contract and seeking money damages, a declaratory judgment as to the parties' rights under both the Charter and the contract and injunctive protection against future breaches.[2] The defendants answered denying any violations and asserting as affirmative defenses: (1) that the subject matter was presently before the Board of Arbitrators; (2) that the statute of limitations had run; (3) that laches, based upon the Firefighters' failure to object to earlier similar discrepancies in compensation, barred relief; (4) that the subsequent enactment of the MPELRL repealed by implication the parity pay provision of the Charter; and, (5) that the parity pay provision in the contract was not bargained for but was included only to conform to the Charter mandate.

In the meantime, implementing the rights given them by the MPELRL, the Lewiston Patrolman's Unit of the Police Department had selected a collective bargaining agent, Local 1828, and had entered into an employment contract with the City Council and the Police Commission on January 1, 1971. This contract determined wages and conditions of employment from that date until January 1, 1974, but permitted the parties to renew collective bargaining for a new wage scale at the end of the first or second years of the contract. The Police Union served notice for such collective

---

1. The Firefighters Arbitration Law was expressly repealed by the MPELRL. P.L.1969, ch. 424, § 971(2).

2. The Firefighters Union and the City have taken the position that the factual questions

of "equivalent ranks" between the Police and the Fire Departments and the amounts of back pay, if any, due the various plaintiffs should be decided by arbitration if these issues are not finally determined by adjudication.

bargaining which began in September, 1971. During the ensuing bargaining, each side offered a new wage proposal which was rejected by the other.

Factfinding was requested (26 M.R.S.A. § 965) in an attempt to resolve this impasse. The factfinders recommended acceptance of the police wage proposal and the patrolmen, not surprisingly, voted to accept this recommendation.[3] The City authorities, however, refused to comply with the recommendation, contending that the City had already entered into a contract with the Firefighters Union, that the parity pay provision of the City Charter prohibited any increase in police pay without a simultaneous corresponding increase in the Firefighters' wages, and that the City did not have sufficient finances to fund both increases.

On April 20, 1972, after extended negotiations, the Police accepted a City wage offer with the condition that, if requested, renegotiation would begin in January, 1973.

When the Police requested renegotiation on January 1, 1973, the City refused to negotiate until the new pay period beginning January 1, 1974, contending that the City Charter compels the City to compensate Firefighters at a weekly rate "no less" than that received by equivalent ranks in the Police Department and that because the City and the Firefighters already had a new contract providing for wages through December 31, 1973, it could not now raise the Police salaries without breaching its contract with the Firefighters.

The Police Union then brought its action against the Police Commission, the Lewiston City Council and the Firefighters Union, asserting that the parity pay provision in the City Charter is inconsistent with and repugnant to the MPELRL which repealed that provision by implication, and that the

MPELRL obligated the City to bargain in good faith with respect to wages. The Police Union sought a declaration that the parity pay provision was repealed by implication and prayed that the operation of this provision of the charter be enjoined.

The municipal defendants answered, joining in the request for a declaratory judgment. The Firefighters Union argued that, as an alleged prohibited labor practice, the Police claim was within the exclusive jurisdiction of the Public Employees Labor Relations Board (now the Maine Labor Relations Board) and as such was barred by the statutory six-month statute of limitations (26 M.R.S.A. § 968(5)(B)).

Both the Police and the Firefighters Unions moved for summary judgment on the Police Union's complaint. The parties to the Firefighter's complaint agreed to submit all legal issues to the presiding Justice, while stipulating to arbitrate those issues left unresolved by final adjudication.

The Justice dismissed the Police complaint, ruling that it alleged a refusal to bargain collectively, a prohibited practice in municipal public employer-employee labor relations, exclusive jurisdiction over which is vested in the Public Employees Labor Relations Board by 26 M.R.S.A. § 968. The Police Union appealed this ruling.

The Justice then turned to the Firefighters' complaint and met the issue common to both actions—the validity of the parity pay provision in the Charter and the Firefighters' contracts. The Justice ruled that the broad scope and design of the MPELRL impliedly repealed the parity pay provision in the Charter.

He then addressed the Firefighters' contention that, regardless of the status of the Charter provision, the right to parity pay

---

3. During this period, the City had signed a new contract with the Firefighters Union, requiring wages similar to those that the City had unsuccessfully offered to the Police. This contract appeared to bring the Firefighters' weekly pay up to parity with that of the Police, but the Firefighters contend it failed to do so because of divergent ranking standards.

should be enforceable as a matter of contract. Holding the contract provision invalid, the Justice determined that the parity pay provision was included in the contract only because the Charter required it and that, even if its inclusion were the result of voluntary collective bargaining, such an agreement is void as contrary to the policy of the MPELRL.

On the question of the period of time that the arbitrators may consider in determining allowable damages representing parity pay, the Justice held that because the right to parity was statutory and not contractual, the proper limitation period was the six-year statute of limitations on civil actions and not the six-month limitation on grievances found in 26 M.R.S.A. § 968(5)(B). Alternatively, he held that if the grievance procedure limitations do apply, they should be applied by the arbitrators and not the Court. Finally, he held that if the Court must consider such defenses, questions concerning the amount of parity pay due under expired contracts prior to the enactment of the MPELRL would properly be before the Arbitrators because of continuous and successive contracts agreeing to parity pay. He held that neither the Court nor the Arbitrators could, however, award damages representing parity pay for any period more than six years prior to the commencement of the Firefighters' action.

The Justice issued a judgment in favor of the Firefighters as qualified by these holdings. Its effect was to limit the Arbitrator's consideration of the Firefighters' claim for additional compensation to the period from January 2, 1966 to the effective date of the MPELRL (October 1, 1969), subject to the effect of the six-year statute of limitations.

The Firefighters Union appeals, alleging that the Court's holding intrudes upon the jurisdiction of the Arbitrators to determine procedural matters regarding the timeliness of claims and the substantive matter of the continuing validity of the contractual pari-ty pay provision. The Union also appeals the Court's determination that the parity pay provision in the City Charter was impliedly repealed by passage of the MPELRL.

For reasons set out below, we hold that the Court erred in its assumption of jurisdiction over the procedural and substantive matters regarding the alleged *contractual* right to parity pay before passage of the MPELRL and remand that matter to the Court for consideration only of the application of the City's affirmative defense of laches. We hold that the Court retains jurisdiction over the Firefighters' claim to parity pay under the *Charter* prior to enactment of the MPELRL. We sustain the Court's ruling on the implied repeal of the Charter and the invalidation of any contractual right to parity pay by the enactment of the MPELRL. Because our decision on the implied repeal of the City Charter provision effectively disposes of the Police Union's complaint against the City, we find it unnecessary to reach the issue of whether the Maine Labor Relations Board had exclusive jurisdiction over that complaint.

*Implied repeal of the Parity Pay Provision*

■ This Court has long acknowledged the principle that repeals by implication are not favored and will not be upheld in doubtful cases. *State v. London*, 156 Me. 123, 162 A.2d 150 (1960); *Inman v. Wilinski*, 144 Me. 116, 65 A.2d 1 (1949); *Eden v. Southwest Harbor*, 108 Me. 489, 81 A. 1003 (1911). Yet this "presumption" against repeal by implication is not an inflexible bar to judicial inquiry but is, rather, a manner of stating legislative intent. *State v. London*, supra, 156 Me. at 126, 162 A.2d at 152. Thus, the implied repeal of an earlier by a later statute is grounded in

" . . . the reasonable inference that the legislature cannot be supposed to have intended that there should be two distinct enactments embracing the same

subject matter in force at the same time, and that the new statute, being the most recent expression of the legislative will, must be deemed a substitute for previous enactments, and the only one which is to be regarded as having the force of law." *Knight v. Aroostook Railroad*, 67 Me. 291, 293 (1877).

A repeal by implication is based upon an inference by the Court, who must, without guidance from any express statement of the legislative will, divine the intent of the legislature from indirect evidence. We have said, therefore, that an implied repeal results when a later statute covers the whole subject matter of an earlier statute or when an earlier statute is repugnant to or inconsistent with a later one (*State v. Taplin*, Me., 247 A.2d 919 (1968)), for duplicative or conflicting enactments are contrary to rational and effective legislation, which goal it is the "intent" of the Legislature to achieve. As succinctly noted by a distinguished commentator, legislative "intent" carries various, equally valid, connotations. Legislative intent may be used to convey a sense of purpose or the general aim of legislation or it may refer to the particularized application for which the statute was designed. Cox, Judge Learned Hand and The Interpretation of Statutes, 60 Harv.L.Rev. 370 (1947).

■ In the latter instance where the particularized application of two statutes produces inconsistent or mutually "repugnant" results, the repeal by implication may be limited to the extent of the inconsistency. *State v. Bryce*, Me., 243 A.2d 726 (1968). When, however, the contest is between a statute of state-wide application and one local in scope, the general purpose and tenor of the state-wide legislation may evidence an "intent" to pre-empt the field and would foreclose the power of a subordinate political unit from enforcing even supplemental or consistent regulations. *Chavez v. Sargent*, 52 Cal.2d 162, 339 P.2d 801 (1959) ; *see Starbird v. Brown*, 84 Me. 238, 24 A. 824 (1892). In such a case, the conflict is one of jurisdiction between the state and a lesser political entity.

■ In the present case, we believe that the overall purpose, scope and design of the MPELRL bespeaks a legislative intent to place under uniform legislation and remove from local control that aspect of public labor relations represented by the parity pay provision. Most probably, the Legislature lacked a specific purpose to invalidate this particular piece of special legislation. We nevertheless believe that the Legislature intended that which will best effectuate the purpose of the MPELRL and we follow that intent by invalidating a charter provision that interferes with its effective functioning.

The stated purpose of the MPELRL is

"to promote the improvement of the relationship between public employers and their employees by providing a *uniform* basis for recognizing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in collective bargaining for terms and conditions of employment." 26 M.R.S.A. § 961 (emphasis added).

To these ends, the MPELRL acknowledges and protects the public employee's right to self-organization and establishes the methods that may lawfully be used to implement that right. Thus, the MPELRL enables employees to form a bargaining unit and select a bargaining representative. It imposes upon the employer the duty to bargain with that representative who has the exclusive power to bargain wages, hours and working conditions for all employees in the bargaining unit. The employees and the employer have the right to establish voluntarily an appropriate bargaining unit; if they are unable to agree on this matter privately, the Executive Director of the Maine Labor Relations Board is empowered to determine the appropriate unit. If determined by the Executive Director, the unit configuration must ensure " . . .

a clear and identifiable community of interest among the employees concerned." 26 M.R.S.A. § 966(2). Although this language in the Maine statute has not yet been construed, nearly identical language in the National Labor Relations Act has been interpreted to mean "a substantial mutual interest in wages, hours and conditions of employment" (mandatory subjects of collective bargaining under both the MPELRL and the National Labor Relations Act). *Allied Chemical & Alkali Workers v. P. P. G. Co.,* 404 U.S. 157, 172, 92 S.Ct. 383, 394, 30 L.Ed.2d 341, 354 (1971).

Unit determination under the MPELRL performs three distinct but interrelated functions:

"First, it creates election districts by determining which of all municipal employees will be eligible to vote in the representation election. . . . Second, the unit determines the community that will be governed by the collective bargaining contract. . . . Third, the unit determination creates an economic unit, identifying those employees whose wages and working conditions will be determined by the collective bargaining contract." McGuire and Dench, Public Employees Labor Relations Law: The First Five Years, 27 Me.L.Rev. 25, 67–8 (1975).

 The institutional purpose of the bargaining unit, then, is to strengthen the bargaining position of the employees as a group. It does so procedurally by aggregating the employees into a unit and thus providing the basic mechanism for collective bargaining; it does so substantively by defining the group whose economic rights and benefits will be governed by majoritarian processes. The bargaining unit is, in short, a fundamental element in the self-governing relation between the public employee and his employer. Indeed, under the National Labor Relations Act,

the coherent bargaining unit is perceived as a necessary condition for effectuating the national labor policy of collective bargaining. *Pittsburg Plate Glass Co. v. NLRB,* 313 U.S. 146, 61 S.Ct. 908, 85 L. Ed. 1251 (1941). In light of the role played by the bargaining unit, we likewise believe that the two fundamental purposes of the MPELRL—freedom of employee self-organization and voluntary adjustment of the terms of employment—are best effectuated through the creation of coherent bargaining units composed of employees who have "an identifiable community of interest" in the subjects controlled by the collective bargaining agreement.

The parity pay provision of the Lewiston City Charter requires Firefighters to receive a weekly rate of compensation "no less" than that received by the Lewiston Police. Wages, of course, are a mandatory subject of collective bargaining. The effect of the parity pay provision is to place the bargaining representative of the Lewiston Patrolman's Unit in the position of negotiating wages not only for those whom he was chosen to represent but, indirectly, for the Lewiston Firefighters as well. The facts of this case · clearly show how the parity pay provision has (to the detriment of efficient collective bargaining) affected the public employer's perception of its freedom to negotiate this aspect of the employment relationship. In other words, the procedures established by the MPELRL for determining the configuration of the unit whose wages will be determined by collective bargaining between its elected representative and the employer are evaded by the parity pay provision which, at the bargaining table, necessarily interjects the interests of the Lewiston Firefighters into the unit created to represent the Lewiston Police. This indirect expansion of the unit whose wages are to be determined by the collective bargaining agreement contravenes the employees' collective right to be included in a unit composed of those with whom they share a "community of

interest" [4] and hence is contrary to the policy of the MPELRL which, to that end, requires that the configuration of all units not voluntarily established by employee-employer agreement be monitored by the Maine Labor Relations Board.

We do not believe that the MPELRL was intended to repeal every statutorily imposed handicap the parties may carry with them to the bargaining table. The public employer, for example, has its bargaining muscle weakened by the various statutes promulgating minimum wage limits for public employees (e.g. 20 M.R.S.A. § 1901; 26 M.R.S.A. § 663(7)) or by its statutory obligation to provide Workmen's Compensation for its employees. The obligations represent minimum requirements upon which the parties are free to build within the negotiating process designed and fostered by the MPELRL. They limit the employer's flexibility in obvious ways; so might they also limit the bargaining of the municipal employee who should realistically expect the financial obligations that the law imposes upon municipal officers in other areas might restrict funds available to meet employee demands. Yet such restraints upon unfettered bargaining do not, as does the parity pay provision, violate the coherence of the bargaining unit and thereby interfere with a right conferred upon employees *collectively* to secure the processes of labor-management bargaining. Social legislation, such as minimum requirements, establishes an *individual* right by guaranteeing the employee a legislatively determined minimum standard of protection. The MPELRL does not guarantee public employees the right to secure ideal wages, hours and working conditions. It does, however, provide a process by which employees are able to advance their demands in those areas. Inhering in the purpose of the MPELRL is a legislative intent that, for the bargaining process to function effectively, the parties must be allowed to conform to the unit determination procedures established by the Act.

▮ We are aware that municipal ordinances or charter provision addressing exclusively local affairs may, in some instances, supersede statutes of state-wide application. *E. g., Strode v. Sullivan*, 72 Ariz. 360, 236 P.2d 48 (1951); *cf.* ME. CONST. art. 8, PART SECOND, § 1. We are also aware of the advantages of municipal autonomy which permits greater responsiveness to local needs. It is clear, however, that the Legislature has already balanced the often competing interests of state and local control and, in the MPELRL, resolved that contest in favor of the state. A series of varying and inconsistent local laws can engender only confusion in the law of public employee labor relations, confusion that is abated only by uniform legislation. *Stephenson v. City of Palm Springs*, 320 P.2d 238 (Cal.App.1958); *see* Glassman, Maine Labor Law, 21 Me.L.Rev. 1, 19–23 (1969).

▮ We conclude, therefore, that the enactment of a uniform, state-wide system for the determination of bargaining units for municipal employees repealed by implication the parity pay provision of the Lewiston City Charter. Both the scope and policy of the MPELRL are sufficiently all inclusive so that, in the absence of any indication of an intent to the contrary, no exclusively local legislation addressing the same area should be permitted. *See Stephenson v. City of Palm Springs, supra; Town of Palm Beach v. Palm Beach Loc. 1866, 275 So.2d 247* (Fla.1973). We believe that the Legislature should be deemed to have intended the repeal in order best to effectuate the policies of the MPELRL.

---

4. Under section 966 of the MPELRL, public employees and their employer are apparently free to determine unit configuration and it is possible that the City, the Police and the Firefighters could establish a unit composed of both Firefighters and Police officers. The appropriateness of this *voluntary* aggregation is not presented by the facts and nothing we say here is intended to prejudge such a possibility.

*Jurisdiction to Decide the Alleged Contractual and Statutory Rights to Parity Pay*

■ All of the several employment contracts between the City and the Firefighters Union provided, by specific reference to the City Charter, for parity pay between the Lewiston Firefighters and the Lewiston Police. The presiding Justice concluded that the parity pay provision was included in the contracts only because it was required by the Charter and that it was not enforceable as a contract right because it had not been "separately bargained for". He further noted, incidentally, that because the continuing validity of the contract provision would render the repeal of the Charter provision "a meaningless gesture", the contract provision was void as contrary to public policy.

We agree with this last conclusion. Contract provisions contrary to public policy are void as nonenforceable. *Pringle v. Gibson*, 135 Me. 297, 195 A. 695 (1937). We have stated above the reasons why the Charter provision is contrary to the policy of the MPELRL. That same rationale invalidates the parity pay provisions in the employment and collective bargaining agreements. From and after the date the MPELRL became effective (October 1, 1969) the contract right to parity pay was unenforceable. Prior to that date, however, both the Charter and the contract parity pay provisions were valid and the Firefighters' Union now contends that the Firefighters are entitled to damages representing allowable pay under those provisions.[5] Because we believe that, until October 1, 1969, the Firefighters' right to parity may have been both contractually and statutorily enforceable, we will consider each of these rights separately.

1. *The Contractual Right to Parity Pay*

The Court's opinion issued upon the parties' motion for summary judgment. Each of the contracts between the City and the Firefighters Union prior to 1969 provided that " . . . wages shall be paid as set forth in the City Pay Plan Police and Fire Schedule . . . subject, however, to the provisions of Section 4A of Article 12 of the City Charter [the parity pay provision] . . . ." The Justice concluded that, *as a matter of law,* this language did not give the Firefighters a *contractual* right to parity pay. We believe the Justice erred in this ruling.

■ In order for the Court to interpret facially the language of a contract provision, that provision must be completely unambiguous. *Blue Rock Industries v. Raymond International, Inc.,* Me., 325 A.2d 66 (1974). Where the contractual language is ambiguous, its meaning is a matter for the trier of the fact. *Wiggin v. Sanborn,* 161 Me. 175, 210 A.2d 38 (1965); *Gillentine v. McKeand,* 426 F.2d 717 (1st Cir. 1970). The trier of fact may in such a case look to parol evidence as an aid in the interpretation of the contract. *Blue Rock Industries, supra*; *Trafton v. Custeau,* 338 Mass. 305, 155 N.E.2d 159 (1959). We do not believe that the question of whether the above provision was included in the contract only as a pro forma recognition of the City Charter provision or was intended to create a contractual right independent of the Charter may be resolved without an evidentiary hearing. The provision in the contract is sufficiently ambiguous to present a "genuine issue as to [a] material fact". M.R.C.P., Rule 56(c). The resolution of this issue should follow a hearing at which the intent, past practice and the bargaining history of the parties may be fully explored.

---

5. The complaint for damages includes as plaintiffs the Firefighters Union and retired, resigned and current members of the Union. Thus, no question is raised of the Union's standing to bring a civil action to recover unpaid wages on behalf of the members. *See Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn S. P. A.,* Me., 320 A.2d 247 (1974).

Therefore, the question whether the Firefighters have any contract right to parity and, if so, whether they are entitled to further compensation under it for the period from January 2, 1966 to the effective date of the MPELRL—and also the question whether, alternatively, the Charter entitles them to further compensation for the period from effective date of the Charter to the effective date of the MPELRL —both remain to be decided.

■ While determination of right to compensation under the *Charter* is a judicial matter, we believe that the questions of the meaning and effect of the *contract* provision should be determined by the arbitration procedures established by the parties' contract and not by the Trial Court.

■ Procedures governing the disposition of anticipated disputes between the parties to a collective bargaining agreement are generally established by that document. The grievance arbitration procedures in the Firefighters' contracts from January 1, 1967, the effective date of the first contract between the parties, to the effective date of the MPELRL are typical.[6] Briefly, they provide that the aggrieved party shall submit his grievance to the Grievance Committee who will either dismiss it or submit it to the Chief of the Fire Department within five days. The Chief must render his decision within seven days after receipt of the grievance. Any appeal from the Chief's decision must be made to the Board of Fire Commissioners within seven days who must, in turn, render their decision within 15 days after receipt of the grievance. Article eight of the employment contract provides that

"[a]ll claims, demands, disputes, differences, controversies and misunderstandings arising under, out of, or in connection with, or in relation to the terms and conditions of this agreement or as to its performance, including but not limited to or by any unresolved grievances . . ."

shall be settled by arbitration. Within five days after notice, the City and the Firefighters Union shall both select one arbitrator who within ten days shall select a third arbitrator. The arbitrators have ten days within which to schedule a hearing which shall be concluded within 20 days after its commencement. The decision of the arbitrators is binding upon the parties. Judicial enforcement of the grievance arbitration agreement is guaranteed by the Maine Uniform Arbitration Act (14 M.R.S.A. §§ 5927–49), which applies to such agreements in both the public and private sectors. *Cf. Maine School Admin. Dist. #5 v. M. S. A. D. #5 Teach. Ass'n,* Me., 324 A.2d 308 (1974).

■ The precise question before us is whether a Court, presented with a complaint seeking money damages for a claimed violation of rights under a labor contract (which contains provisions for binding grievance arbitration) and also a claim for entitlement to the same damages as a matter of law, should withhold determination of the legal issues and send the dispute to arbitration under the contract. We believe that the underlying purpose of the MPELRL compels a conclusion that issues reasonably arguably subject to arbitration under the parties own agreement should generally be sent to arbitration by the Court.[7] In the absence of controlling language in our own statute, we find the federal experience persuasive.

In the so-called Steelworkers Trilogy *(United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) ; *United Steelworkers of America v. Warrior & Gulf Naviga-*

6. Because any contractual right to parity pay can be enforced only under contracts effective between these dates, the grievance arbitration procedures of those contracts must control any disputes arising under their provisions.

7. We are not unanimous as to the defense of laches, to be discussed later.

*tion Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L. Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Co.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)), the United States Supreme Court held that the role of the judiciary in determining whether a dispute is arbitrable under a given grievance arbitration clause is restricted to ascertaining whether the parties have agreed to arbitrate disputes and, if so, whether the party seeking arbitration is making a claim which, *on its face*, is governed by the collective bargaining contract. Where such is the case, the Court may not inquire into the merits of the grievance but should remand it to arbitration. The Court partially grounded its decision upon the role of the arbitrator which it described as follows:

> "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement

permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the aggreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." *United Steelworkers v. Warrior & Gulf Navigation Co.*, supra, 363 U.S. at 581–2, 80 S.Ct. at 1352–53, 4 L.Ed.2d at 1417.

The Court further based its strong preference for arbitration over judicial settlement upon its belief that it was effectuating the congressional intent as manifested in section 203(d) of the Labor-Management Relations Act (29 U.S.C. § 173(d)) which states in part:

> "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement."[8]

The MPELRL contains no such language. Under its provisions, however, contract grievance procedure is a mandatory subject of collective bargaining and this,

8. The Court also considered arbitration a desirable alternative to strikes or work stoppages. The Supreme Court has expressly recognized that the employees' surrender of their right to strike in the private sector is the "quid pro quo" for the employer's agreement to submit disputes to arbitration. *E. g., The Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 248, 90 S.Ct. 1583, 1591, 26 L.Ed.2d 199, 208–09 (1970). As noted infra, the MPELRL specifically prohibits public employee strikes and this prohibition could, under the traditional view of the relation between no-strike and grievance arbitration clauses, require a more limited role for arbitration under the MPELRL. Recently, however, the Supreme Court while holding that

an arbitration provision implied a duty not to strike, noted that the employer's contractual duty to arbitrate is not necessarily dependent upon his employees' agreement not to strike:
> "[A]n arbitration agreement is usually linked with a concurrent no-strike obligation, but the two issues remain analytically distinct. Ultimately, each depends on the intent of the contracting parties. It would be unusual, but certainly permissible, for the parties to agree on a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation." *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583, 594–95 (1974).

we believe, evidences legislative recognition that arbitration is the "desirable method" for settling contract disputes under the MPELRL. We therefore conclude that the Supreme Court's construction of the National Labor Relations Act as amended is applicable to the MPELRL in the present case so far as the present issue is concerned.

In addition to the reasons given by the Supreme Court in the Steelworkers Trilogy, we perceive a reason unique to the MPELRL for limiting the function of the Trial Court to determining whether the subject of the alleged dispute is one which the parties have agreed to arbitrate. We noted in *City of Biddeford v. Biddeford Teachers Ass'n*, Me., 304 A.2d 387 (1973):

" . . . the [MPELRL] does not contemplate the delegation of authority to public administrative boards or agencies but instead gives it to ad hoc panels whose memberships are not to be controlled by governmental action. Here we are of the opinion that the Legislature, mindful of the denial to municipal employees of such economic weapons as strikes and work stoppages which are available to employees in private employment, has sought to avoid the disruptive feelings of resentment and bitterness which may result if the governmental employee may look only to the government for redress of his grievances." 304 A.2d at 398.

■ Although this was stated in the context of interests arbitration, we believe it has application to arbitration of grievances and that in addition to the entitlement to impartial arbitration, the Legislature considered that the unavailability to public employees of these "economic weapons" entitle them to an efficient and expeditious procedure for settling labor disputes. As evidenced by the relative brevity and specification of the arbitration procedures established by the contracts here in issue, the arbitral process provides such a method.

"Arbitration agreements are for specific terms, generally much shorter than the time required for the adjudication of a contested lawsuit through the available stages of trial and appeal. Renegotiation cannot await the outcome of such litigation; nor can the parties' continuing relationship await it." *Textile Workers Union v. Lincoln Mills*, 353 U. S. 448, 463–4, 77 S.Ct. 912, 923, 924, 1 L. Ed.2d 972, 984 (1957) (opinion of Frankfurter, J., dissenting); *see* Shulman, Reason, Contract and Law in Labor Relations, 68 Harv.L.Rev. 999 (1955).

In short, a time-consuming and laborious judicial settlement of a labor dispute is just as likely to engender "disruptive feelings of resentment and bitterness" among public employees as would the perceived unfairness of the settlement of their disputes by a governmental agency.

We are satisfied that, in such a situation as this, the Steelworkers' philosophy that arbitration is more appropriate than trial procedures for initial disposition of contract grievance disputes in the private sector, is equally acceptable in the public sector.

Although the City and the Firefighters are obligated to submit to arbitration only those issues they have agreed to submit, we think that the arbitration clauses do obligate the parties to submit the interpretation of the provision now in question to arbitration. The arbitration clauses cover "all claims, demands, disputes, differences, controversies and misunderstandings arising out of, or in connection with, or in relation to the terms and conditions of this agreement or as to its performance . . . ." This language is, on its face, broad enough to encompass the present dispute.

■ We wish to make clear, however, that the arbitrator has authority to settle this dispute only if he determines that the agreements between the City and the Union gave the Firefighters a *contractual* right to parity pay. The origins of the

statutory and alleged contractual right to parity pay are legally independent. The arbitrator's authority is grounded in the contract which he must interpret and apply in accordance with "the common law of the shop". *United Steelworkers v. Warrior & Gulf Navigation Co.,* supra. He may resolve only issues of contractual rights and if his decision is based "solely upon the requirements of enacted legislation" he has exceeded his authority and his award is unenforceable. Ibid; *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 53, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147, 161 (1974). Because arbitration is institutionally incompetent to effectuate the requirements of statutory law, the first issue to be resolved by the arbitrator is whether the parties intended in the contract to create an independent right to parity pay. If he determines that they did not and that the contract merely echoes the statutory right, he can go no further.

▮ We do not agree with the Justice's conclusion that the six-year statute of limitations (14 M.R.S.A. § 752) must be applied to the Union's claim to its right to back pay under the contractual parity pay provisions. Arbitration is not an action at law and the statute is not, therefore, an automatic bar to the Firefighters' recovery. Moreover, an adequate consideration of procedural questions often requires analysis of the merits of the dispute and the final disposition of such questions should be left to the arbitrator. *See Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

▮ It is the opinion of the majority[8] of the Justices sitting in this case that the arbitrator should also decide the issue of "laches" asserted in the City's answer as an "affirmative defense" to the City's being required to perform the contract.

▮ When raised in a Court proceeding a claim of laches has a degree of uniqueness because it is cognizable only in equity as addressed to the Chancellor's "conscience". Yet, the substantive subject-matter of a laches contention projects no distinctive, or difficult, concepts of law. Laches is an appeal to fairness in particular factual circumstances. The laches "defense" addresses whether basic fairness requires that the party alleged to have bro-

8. The writer of this opinion disagrees with this conclusion. The defense of laches applies to a party's failure to assert a right for "an unreasonable and unexplained" length of time when this failure results in prejudice to the adverse party. *A. H. Benoit & Co. v. Johnson,* 160 Me. 201, 207, 202 A.2d 1, 5 (1964). Laches is an equitable defense and is based upon another's good-faith change in position, represented, for example, by opposing party's inability to reproduce evidence lost through the passage of time. *Stewart v. Grant,* 126 Me. 195, 137 A. 63 (1927). However skilled the arbitrator may be in resolving disputes based upon hours, wages or other issues customarily arising under the terms of a collective bargaining agreement, I do not believe that his particular expertise in the "common law of the shop" renders him uniquely qualified to apply this equitable doctrine. Courts, on the other hand are well experienced in considering affirmative defenses to the enforceability of contracts and I do not believe that that consideration would hopelessly entangle the Court in substantive matters.

I believe that the language in the collective bargaining agreement to which the majority alludes should more reasonably be interpreted as referring to differences over hours, wages, working conditions, etc., the types of disputes typically arising under an employment contract and, no doubt, the types of disputes envisioned by the parties when the contract was signed. It seems somewhat improbable to assume, as does the majority, that the contracting parties intended that language to encompass a refined and, except to members of the legal profession, obscure legal doctrine. Despite its equitable origins, the defense of laches has generated a core of distinctive legal principle and the writer of this opinion cannot assume that the legal defense of laches is entirely coincident with the considerations of "fairness" that the arbitrator brings to bear upon his decision. In my opinion, the considerations appropriate to the resolution of this issue should properly be left to the judiciary.

I would remand the issue to the Superior Court to determine whether the Firefighters' claim under the contract is barred by laches. Then, if the Court should decide that the Union was dilatory in bringing the dispute to the City's attention, it would not submit the dispute to arbitration.

ken his contract should be excused from performing it when (1) the adverse party claiming entitlement to performance has for an unreasonable length of time failed to seek to vindicate his right to performance, and (2) the party from whom performance is sought, relying in good faith on the other party's non-action, has changed his position.

Thus, nothing in the substantive content of a laches claim precipitates any matter of important public policy which should prohibit the parties to a collective bargaining agreement from including, as they may deem appropriate, laches questions among those finally to be decided by arbitration. Indeed, it is common for arbitrators to deal with the factual aspects of the relative positions of contracting parties and to evaluate what may be fair to the parties in all the circumstances precisely because it is an acknowledged function of arbitration to seek to maintain harmonious relations between the disputing parties by doing essential "equity", as reasonably possible.

Here, then, the critical question is whether the contracting parties had agreed to submit the matters precipitated by the laches claim to the final decision of an arbitrator.

The instant collective bargaining agreement provides that an arbitrator shall decide

". . . differences . . . arising out of, or in connection with, or in relation to the terms and conditions of this agreement or . . . its performance . . . ."

The objective import of this extremely comprehensive language is that the agreement of the parties fairly encompasses within the scope of arbitrational decision the subject-matter of a claim of laches, as focused upon the fundamental fairness, in a particular factual context, of requiring the City to perform the contract.

## 2. The Statutory Right to Parity Pay

■ Regardless of the existence or non-existence of a contractual right to parity pay, the Firefighters clearly had a *statutory* right to parity pay until October 1, 1969. The Firefighters are entitled to enforce this right in the Court and if they prevail may, subject to the six-year statute of limitations, recover damages representing allowable parity pay. Assuming the existence of both a contractual and a statutory right to parity pay, their origins are independent of one another and we are not aware of any inconsistency in attempting to enforce them successively before two different forums when those forums are, according to their respective natures, uniquely suited to the vindication of those rights. An analogous situation occurs under the National Labor Relations Act when the consideration of a claim by an arbitrator does not foreclose the subsequent consideration of the same claim by the National Labor Relations Board as an unfair labor practice. *Carey v. Westinghouse Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed. 2d 320 (1964).

.The only danger presented by the possible dual enforcement of the two rights is possible dual compensation, once from the arbitrator for parity pay due under the pre-MPELRL contracts and again in court under the Charter provision. The Court, however, has the power to shape relief in a manner that would prevent such an unconscionable windfall to the plaintiff.

The entries will be:

The appeal of the Police Union is dismissed without prejudice to its right to seek injunctive relief again if necessary.

The appeal of the Firefighters Union is sustained in part and the matter is remanded to the Superior Court for proceedings in conformity to this opinion.

DUFRESNE, C. J., and DELAHANTY, J., did not sit.

All Justices concurring.