### CITY OF AUGUSTA
v.
### Edmund QUIRION.

Supreme Judicial Court of Maine.

Argued June 17, 1981.

Decided Oct. 30, 1981.

Sanborn, Moreshead, Schade & Dawson, Lee K. Bragg (orally), Charles E. Moreshead, Augusta, for plaintiff.

Marcou & Marcou, Louis R. Marcou (orally), Waterville, for defendant.

Before McKUSICK, C. J., and WERNICK,* GODFREY, ROBERTS and CARTER, JJ.

---

* Wernick, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

CARTER, Justice.

The defendant, Edmund Quirion, is the developer of a subdivision in the City of Augusta. Quirion appeals from a judgment entered for the City in Superior Court (Kennebec County) in the City's suit arising out of Quirion's failure to pay for street paving in his subdivision. We modify the judgment below.

In 1972, Aimé Quirion, the defendant's father, submitted plans to the City of Augusta for the "Grandview Subdivision" on premises owned by him. The plans, which included portions of the subdivision to be located on Kenneth Street and Edward Street, was approved by the City. In May 1973, Aimé Quirion petitioned the City for acceptance of 300 feet of Kenneth Street. The Augusta City Ordinances[1] required a developer to pay one-half of his share of the cost of finishing the street prior to the City placing the base gravel, and the other half prior to the City commencing the final surfacing and accepting the street but no later than one year after the making of the first payment. Pursuant to that City Ordinance, Aimé Quirion paid the City two dollars per foot—representing one-half of his share of the total cost, and the City applied the base gravel.

Aimé Quirion died in July 1973 and in October of that year, Edmund Quirion petitioned, on behalf of his mother who then owned the subdivision property, for acceptance of an additional 312.27 feet of Kenneth Street and made the initial payment of two dollars per foot. In May 1974, Quirion petitioned, as the then owner of the subdivision, for acceptance of 855 feet of another street, Edward Street, and again made the two dollar per foot payment. The City applied the base gravel on both sections. Quirion never made any further payment.

In 1975, the City Ordinance was amended to increase the developer's share of the cost of street finishing from four dollars to twelve dollars. In June, 1976, the City billed Quirion for the second half of the developer's share of finishing the three sections of street, at the rate of $6.00 per foot. Quirion refused to pay, indicating that he was willing to pay only $2.00 per foot. In January 1977, the City commenced this action demanding payment of $6.00 per foot for a total of $8,803.62.[2]

By agreement pursuant to M.R.Civ.P. 53(b)(1), the case was tried before a Referee. As part of a pretrial order, the parties had stipulated that:

1. The defendant remains obligated to the City of Augusta in the minimum of $2.00 per foot for the unpaved portions of Kenneth Street and Edward Street.

. . . .

3. The unpaved portions of the streets that are involved in this dispute are as follows: Edward Street—855 feet; Kenneth Street—612.27 feet.

. . . .

6. That defendant entered into contractual commitments for the City of Augusta, whereby the defendant agreed to pay a share of the cost of surfacing

---

1. Augusta City Ordinances, Section 20–44(f) provided:

    The developer shall pay as his share of the cost of finishing the street at the rate of four dollars ($4.00) per foot for forty (40) foot streets and five dollars ($5.00) per foot for fifty (50) foot streets and other width streets proportionately. The developer shall pay one-half (½) of his share prior to the city placing the base gravel and the balance prior to the city commencing the surfacing and final acceptance of such street, final payment to be made no later than one (1) year from the date of the developer's first payment. The developer shall give the city a six (6) week notice in petitioning for such street and placing of base gravel.

A 1975 amendment resulted in the substitution of "$12.00" for "$4.00" as the developer's share in respect to a 40 foot street.

2. The City's complaint joined as plaintiffs the owners of lots abutting the affected streets in the subdivision. Under Counts III, IV, and V of the complaint, the lot owners sought injunctive relief and compensatory damages, but those counts were not adjudicated by the Superior Court. On the defendant's first attempted appeal, in March 1980, we remanded the case for lack of a final judgment. On remand, the claims of the individual plaintiffs were dismissed by stipulation of the parties, pursuant to M.R.Civ.P. 41(a).

the subject streets, as required in turn by the City Ordinances.

Although the pleadings and pretrial orders are unclear as to the nature of the City's claim, the Referee concluded that a contract arose between Edmund Quirion and the City when Quirion filed his "Street Petitions" and made the initial payments.[3] The Referee also found that Edmund Quirion had accepted the benefits of and had become obligated under the contract entered into by his father. The Referee also found that Edmund Quirion had become the substituted contracting party under the contract entered into by his father. Noting that the Ordinance gave the developer one year within which to make his final payment, the Referee found that Quirion "lost the benefit of" the two dollar rate in the prior Ordinance when the year expired on each contract with no final payment being made. Concluding that he then became bound by the pertinent terms of the 1975 Ordinance in effect when the action was brought, the Referee recommended judgment for the City at the rate of $6.00 per foot. The Superior Court overruled Quirion's objections, accepted the Referee's Report, and entered judgment for the City in the amount of $8,803.62. The only issue properly before us[4] on Quirion's appeal is whether defendant is liable under the contract at the $2.00 or $6.00 per foot rate for his second installment payment. The defendant argues that he is liable only at the $2.00 per foot rate according to the Ordinance in effect when the street petitions were filed.[5]

The pertinent portion of the Report of the Referee stated the issue to be decided to be "... at what rate defendant must reimburse Augusta." The Referee then set out the portion of Section 20–44(f) which he thought to be controlling on the stated issue. The Referee then states:

> When the Ordinance was amended, the only change in the provision relevant to this dispute was to substitute "$12.00" for "$4.00". So here the defendant had one year in which to make final payment at the lower rate. *When the year had expired on each contract with no final payment being made, defendant lost the benefit of that rate and was bound by the terms of the amended Ordinance in effect when action was brought.*

(Emphasis added.) Thus, the Referee construed the contract language to require payment by the developer in accordance with changing rates under the Ordinance.

This construction of the language of the documents making up the contract was in error. Under the Referee's view of the nature of Quirion's obligation, this conclusion was tantamount to permitting one party to a contract unilaterally to change its terms. On the contrary, the contract terms

---

**3.** Neither party has challenged the Referee's characterization of the relationship between the parties as a contractual one. On this state of the record, we accept and do not review this characterization.

**4.** Quirion has argued before us that the City cannot claim payment under the petition filed by his father for the first 300 feet of Kenneth Street because the City filed no claim against his father's estate. The defendant's stipulation that he is obligated to pay for that footage under "contractual commitments" he has formed with the City precludes him from raising this issue or from attacking on appeal the Referee's conclusion that he had assumed his father's obligation under the original contract and had been substituted as a party to that contract.

The stipulation likewise forecloses any contention by the defendant that the Referee was in error in finding that a contract was formed by the conduct of the parties.

**5.** First, he argues that damages based on the 1975 amended ordinance violate section 1–6 of the Augusta City Ordinances, which reads:

> The repeal of an ordinance shall not affect any punishment or penalty incurred before the repeal took effect, nor any suit, prosecution or proceeding pending at the time of the repeal for an offense committed or cause of action arising under the ordinance repealed.

There is no merit to this argument. The developer's obligation to pay his share of the cost for the street finishing is not a "punishment or penalty." The City's suit was not a "suit, prosecution or proceeding pending" at the time of the 1975 amendment. Even if we were to assume that the 1975 amendment constituted a "repeal" of the prior ordinance, section 1–6 is not applicable here.

must properly be analyzed at the point in time when the contract is formed.

The contract consisted of the "Street Petition" and the language of pertinent sections of the City Ordinance. For present purposes, the relevant portion of the Ordinance is the language of section 20–44(f) of the Ordinance. The Petitions state that the signatories thereto ". . . in consideration of said acceptance [of the specified street or portion thereof] agree to fulfill the obligations of a developer under the City Ordinance as to construction of said street [and] to pay our proportionate share of the cost of said street . . . ." The language of the pertinent portion of the Ordinance, as part of the contract, defined the obligations of the developer. That section sets out the developer's obligations in respect to (1) the amount of the developer's proportionate share of the cost of the street, (2) the manner in which said share is to be paid and (3) the time within which it is to be paid. Each of these is a contract term. These terms are specified in the first two sentences of section 20–44(f). The first sentence specifies the share of the cost of the street at a rate per linear foot to be borne by the developer on the basis of the width of the street to be constructed and accepted by the City. In this case, the applicable rate was $4.00 per foot under the Ordinance as it existed when the contract was formed. The second sentence specifies both the manner and time of the payment of the developer's share. It provides that the share of the developer shall be paid in two installments. These installments are to be paid in sequence, the first ". . . prior to the City placing the base gravel . . . ." and the second installment is required to be paid ". . . no later than one (1) year from the date of the developer's first payment."

■ The construction of contract language is a matter of law for the court to determine. *Soper v. St. Regis Paper Co.,* Me., 411 A.2d 1004, 1006 (1980); *T-M Oil Co., Inc. v. Pasquale,* Me., 388 A.2d 82, 85 (1978). Contract language is to be construed to implement the intent of the parties. *Corbett v. Noel,* 160 Me. 407, 413, 205

A.2d 165 (1964); *Salmon Lake Seed Co. v. Frontier Trust Co.,* 130 Me. 69 (1931); *see Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262, 271 (D.Me., 1977). The situation of the parties must govern the construction of contract language. *See Ames v. Hilton,* 70 Me. 36, 43 (1879). The language employed by the parties is to be construed to give effect to the plain meaning of the words used. *Soper,* at 1006; *T-M Oil Co., Inc.,* at 85; *Lewiston Fire Fighters Ass'n, Local 785 v. City of Lewiston,* Me., 354 A.2d 154 (1976).

■ Applying these principles to the language of section 20–44(f), the first sentence deals exclusively with the determination of the amount of the developer's share of the cost of the street referred to in the street petition. Only this first sentence speaks to the determination *of the amount of* the developer's share of the cost. It does so very directly and clearly. It says simply that the developer shall pay *"as his share of the cost"* $4.00 per foot for a forty foot street. Nowhere else in the contract language is the subject of *the amount of* the developer's share of the cost dealt with either expressly or by implication. This Ordinance language was in effect when all three of the "Street Petitions" in this case were filed. In each case, the first installment of one-half "the developer's share" was paid when each petition was filed. By the plain and unambiguous language of the petition and Ordinance, construed together as a whole, a "contract" was thereby created by the terms of which the City was to surface and accept in accordance with the terms of the Ordinance a total of 612.27 feet of Kenneth Street and 855 feet of Edward Street, for which the defendant was obligated to pay $4.00 per foot. Thus, by this language, the basic obligation of the City was described and the extent of the defendant's obligation to pay money in consideration of the City's performance of its obligation was also clearly and distinctly stated.

■ A part of the contract language (*e. g.,* the Ordinance) then goes on to state *further* terms. These terms do not facially

purport to deal with *the amount* of the developer's payment under the contract but only with *the manner* and *the time* of payment. This language provides for two payments and specifies the time each is to be made. The language is silent as to the consequence of a developer's failure to properly perform the terms as to the manner and time of the payment of the developer's share. Those terms are material terms of the contract and the failure of the developer to perform in compliance with them is contemplated by the language to constitute a breach of the contract. On such breach, the City had a right of action to enforce its rights under the contract by recovering the damages directly flowing from the breach. The amount of such damages is clearly contemplated by the language to be the amount of the contracted-for performance of the developer. That performance is the payment of $4.00 times the requested number of accepted feet of street prior to the final acceptance of the street.

■ There is nothing in the language in either the Petition or the Ordinance indicating that the amount of the developer's share contemplated by the parties is to change because of circumstances occurring after the formation of the contract. It can only be taken to be the meaning of this language that the developer is obliged to pay his share of the cost of the street at the amount clearly spelled out in the language, that is, at $4.00 per foot of street. Any attempt to read into or imply from the plain language before us an additional contract term providing for the amount of the developer's share to change *in futuro* would do manifest violence to that meaning.

■ Thus, the City here, having proceeded to complete the surfacing of the street, was entitled to recover from the developer, by a legal action for breach of contract, the clearly specified value of his promised performance as provided for in the contract language. The defendant, having paid his first installment payment of $2.00 per foot, remained liable because of his breach of the terms of the contract respecting the man-

ner and time of payment for the second installment payment at $2.00 per foot of street. He was, in fact, in breach of these terms as he concedes by stipulation. The total linear footage covered by the three contracts was 1,467.27 feet. Therefore, on the record made in the case, the extent of the defendant's further liability measured by the plain language of the contract is properly $2,934.54. That is the principal amount for which judgment should have been entered against him under this contract.

■ The City contends that it is the intent of the language discussed above to create an obligation that is subject to change as the Ordinance changes. The first and most telling answer to that contention is the one displayed above; the plain, unambiguous language does not convey or reasonably imply any such meaning. There is a further difficulty with this argument. Assuming that the subject language can reasonably be read to mean that the amount of the developer's share is to change as the language of the Ordinance changes, subsequent to the formation of the contract, the City cannot demonstrate *from the language* at what point in time, with respect to a particular street project, such a change is to be operative. Is a change in the ordinance rate to be operative with respect to a particular contract if it occurs after the first payment is made but within a year of it? Or is such a change to be operative only where it takes effect more than a year after the first payment is made and then only if the developer has not timely paid the second installment? In the latter situation, is the Ordinance rate prevailing at the time the City demands payment of the second installment, at the time the City actually does the surfacing work, at the time the City legally accepts the street, or (as the Referee found) at the time the City brings its law suit, to control the determination of the amount of the developer's share of the cost? The contract language is silent as to the resolution of any of these questions. These questions must be capable of resolution from the language of the

agreement if the City's construction is to be supportable.[6] Additional difficulties with the City's theory are present. If an increase in the Ordinance rate is to control the amount of the second installment, why should it not also control the amount of the first installment even though it is already paid at the time of the Ordinance change? By the Ordinance language, the amount to be paid is all one "share" to be paid in two installments. If an Ordinance change effects an increase *in the share*, what reason can be assigned as to why both installments should not change to properly mirror the amount of the increased total share of the developer? Yet, the City has never claimed, in this case, that the defendant owes any increased amount attributable to his first, paid installment.

Thus, it is demonstrable that the sparse, plain language of the contract cannot be stretched or tortured to provide meaning sufficient to make the City's theory of interpretation of the language workable. Even on this appeal, the City attempts to support the Referee's decision, and the judgment entered pursuant to it, by asserting its entitlement to recover at higher rates than that used by the Referee.

Yet, even on the assumption that the contract language may be construed to mean that the defendant's share of the cost was to vary in accordance with changes in the rates specified at various times in the Ordinance, the City cannot provide any principle capable of being extracted from the language in question, or from any other source of legal authority, that would clearly determine which of the several Ordinance rates indisputably applies or at what point in time such applicable rate is to be determined. The reason seems clear to us to be that the possibility of the application of rates to specific contracts as they varied in the Ordinance was beyond the contemplation of the parties at the time this contract was formed. The contract language is silent on this matter, which the City now asserts to be of such fundamental impor-

tance, for a very good reason; not even the City had considered, in 1973 when the contracts in issue here were formed, that any rate other than those *then* specified in the Ordinance would apply *to these contracts*. Nothing in the record suggests, even remotely, that the defendant had, or had any reason to have, such a possibility within *his* contemplation. We believe that under these circumstances the more probable and reasonable intention of the parties was that the rate at which the developer's share is determined was not meant to change with respect to a contract once it was formed. *E. g., Monk v. Morton*, 139 Me. 291, 295 (1943).

The entry is:

Judgment vacated.

Remanded to the Superior Court for entry of a judgment in favor of the plaintiff and against the defendant in the amount of $2,934.54 plus interest and costs.

All concurring.

---

**6.** The City set out in its brief a schedule of changes in the Ordinance rate for the develop-

er's share of street costs ranging from $4.00 in the period 1972–74 to $22.75 in 1979.