STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-14-452

PETER GERRITY and
MARIE GERRITY,

Plaintiffs

JUDGMENT

v.

NICHOLAS ADDIVINOLA
and ANGELA CELLUCCI,

Defendants

Jury-waived trial on plaintiffs' complaint and defendants' counterclaim was held on 8/4/15. All parties appeared and were represented by counsel.

Within 30 days after defendants left the house they rented from plaintiffs, plaintiffs retained defendants' security deposits totaling $3,700.00 and demanded additional damages of $3,177.35. (Ex. 1, §§ 3(d) & (e); Pet Agreement; Security/Damage Deposit Agreement; Ex. 7.) In their complaint, plaintiffs requested retention of defendants' security deposits, additional damages of $8,828.76, attorney's fees, and costs. At trial, plaintiffs' demand for damages increased to a range of $9,777.15 to $13,923.76. (Ex. 31.) In their counterclaim, defendants requested the return of their security deposits, damages pursuant to 14 M.R.S. § 6034(2), attorney's fees, and costs.

Findings

Plaintiffs own a house in York Harbor, Maine located on land inherited from plaintiff Peter Gerrity's father. From 1987 to 2000, plaintiffs rented the first house on the property. The current house on the property was built in 2000 and paid for by plaintiff Peter Gerrity's father. Because the property is very expensive to maintain, plaintiffs have rented the second house throughout the year since 2000 to pay for

expenses and maintain the property in the family. According to plaintiff Marie Gerrity, the house is "virtually spotless" before fall tenants move in.

Defendant Addivinola works in the Mortgage and Acquisition Group for SunEdison. Defendant Cellucci is a stay-at-home mom for defendants' son and their 32-pound poodle-Bernese Mountain dog, Chewbacca. (Exs. 25A, B, C, I.)

In September 2013, the parties entered a lease agreement facilitated by rental agent Wendy Casey. The lease is the only written agreement executed by the parties. The remainder of their transactions took place by email or phone. (Exs. 17-23.)

The lease provided defendants would rent plaintiffs' house in York Harbor, Maine for $2,200.00 per month. Defendants paid a security deposit of $2,200.00 and a pet security deposit of $1,500.00. (Ex. 1; Pet Agreement; Security/Damage Deposit Agreement.) The house consists of a kitchen, living room, family room, dining area, and two bedrooms on the first floor and three bedrooms on the second floor, one of which was locked. The boys' bedroom (driveway) contained two twin beds and a queen bed. Lucy's bedroom (oceanside) contained a queen bed.

Relevant provisions in the lease provide:

> If on termination of this tenancy for any reason, Lessee does not leave the leased premises in reasonably clean and rentable condition, excluding "normal wear and tear", the Lessor shall retain any portion of the security deposit as may be reasonably necessary to put the premises in such clean condition. As used herein, the term "normal wear and tear" means that deterioration which occurs, without negligence, carelessness, accident or abuse of the premises or equipment by the Lessee, members of the Lessee's household or their invitees or guests. The term does not include sums or labor expended by the Lessor in latent property repairs.
>
> . . .
>
> If no cause exists for retention of the security deposit, within thirty (30) days after Lessee surrenders the premises, it shall be returned to Lessee directed to the address left by Lessee

2

specifically for such purpose, or if no address is left then to the Lessee's last known address.

. . .

Lessee shall make no alterations to the buildings on the leased premises nor construct any buildings or other improvements on the leased premises without first having obtained the written consent of Lessor.

. . .

Lessee shall promptly notify Lessor of any changes in the condition of the premises, equipment or appliances immediately. Repairs to equipment due to negligence or misuse by Lessee, family members or Lessee's guests shall be the responsibility of Lessee to repair by a professional or to replace broken equipment.

(Exs. 1, §§ 3(d) & (f); 6; 8(b).)

Defendants moved into the house on 10/31/13, eight hours earlier than the beginning of the lease. The lease terminated on 5/31/14. Defendants extended their stay until 6/14/14 although there was no written documentation of the extension. The rent increased to $1,000.00 per week during the additional two weeks in June. After defendants moved out, three different tenants rented the house during fall 2014, for one-month, two-weeks, and one-week tenancies.

The lease required defendants to examine the premises within one week of occupancy and notify lessor of any damages, repairs, or other problems. (Ex. 1, § 8(a).) Defendant Addivinola had rented many apartments in the past and was unaccustomed to a rental agent requiring that he do this. But at the request of the agent, he emailed to her the notification and photographs a week beyond the due date. (Exs. 2, 3.) He traveled to Washington, D.C. for work a few days after moving in and defendants then attended a wedding so the deadline was missed. Plaintiff Marie Gerrity testified she did not receive the notification or photographs.

3

Defendant Addivinola stated he did not do as thorough an inspection and notification as he should have done because he was used to relying on a handshake. Everything in the house was "well-worn" and it made sense to him to use the property as rental property. He realizes, in retrospect, he should have videoed a walk-through. The carpets, dining room table, and bureaus were stained. Paint was chipped and the walls had marks. The hardwood floors were in good but not perfect condition. (Ex. 3.)

Only defendants' dog resided at the house but other dogs visited. (Exs. 25D, E, F, G.) Defendant Addivinola agreed at trial that no permission was sought for dog visitors. (Ex. 1, Pet Agreement, ¶ 10.) Defendants volunteer at a dog rescue and one dog visitor was a foster dog that defendant Cellucci was transporting. (Ex. 25G.) Defendants agreed also that their dog was on the furniture. They bought large throws for the couch. (Exs. 1, Pet Agreement, ¶ 9; 25A, 25B, 25C.) Defendant Addivinola stated he and his wife try to train their dog well but "he does not always listen."

On one occasion, defendants' dog became stranded in Lucy's bedroom when defendants were away from the house having dinner at a restaurant. (Ex. 1, Pet Agreement, ¶ 3.) The dog became scared and clawed and tore the carpet. Defendant Addivinola hired a person from Craig's List to repair the carpet, using the piece of carpet that matched the wall-to-wall carpet and that was placed at the room entrance. (Ex. 24U.) He did not notify plaintiffs of the repair because he deemed the repair acceptable considering the condition of the carpet. Notwithstanding, in a 6/19/14 email exchange between defendant Addivinola and plaintiff Marie Gerrity, he agreed to pay "whatever you deem appropriate" because, he testified at trial, "I'm not that bad of a guy." (Ex. 22.)

Defendants' son was given a Cozy Coop as a gift when he was six months old. The Cozy Coop is for children one and one-half years old and older. The child did not

4

run around the house in the Cozy Coop because he did not run at the time. Defendants did not push him in it. They took a photograph of their son in this gift but kept it outside. (Ex. 25H.)

The garage door broke the first time defendant Addivinola tried to open the door. (Ex. 24B.) Defendants did not use the garage. The front door closer also broke with use. Defendant Addivinola did not know if the lampshade in Lucy's bedroom was broken when defendants arrived at the house. (Ex. 24EE.) Defendant Cellucci did not damage the lamp and did not remember a damaged lamp. Defendant Addivinola stated there was no trash barrel when they arrived but he "does not fight over a $10.00 trash barrel." He agreed he did not move some patio furniture inside as required. (Ex. 1, p. 9, ¶ 10.)

Defendant Cellucci put a bath mat in the closet and did not use it. She placed it on the floor when they moved out. (Ex. 24GG.) Defendants did not place items in the cupboards because there were so many things in the cupboards when they arrived. (Ex. 24H.)

Defendants used the oven no more than three or four times and defendants do not believe they broke the oven hinge. Defendant Cellucci does not bake or cook, which is a running joke between defendants; defendant Addivinola is a vegetarian and their son ate baby food and drank milk. Defendants fell into the habit of ordering take-out while residing in New York City. Defendant Addivinola thought the stove was fairly old and the price to repair the hinge seemed unreasonable to him.

Defendant Addivinola used two pods at the property. He expected they would be removed the day before he moved from the house but one pod remained. He was not aware the pods violated the lease; he did not consider them a trailer. (Ex. 1, § 9(c).) Although plaintiff Marie Gerrity stated in her 7/12/14 email that if plaintiffs had

known about the pods, they would not have allowed them, she stated in her 6/13/14 email that her husband knew about the pods. (Ex. 6.)

Defendant Addivinola took time from work to help clean before moving out of the house. Defendants and his mother, Deborah Addivinola, cleaned the house before they left, including steam cleaning and vacuuming the carpets and washing the floors. Because defendant Cellucci did not feel well, they also hired a person from Craig's List to assist in cleaning the house. The person worked for four or five hours and was paid at least $100.00. The person removed the trash because they did not want to leave trash, which would not be picked up until the following Monday.

Defendant Addivinola cleaned the stovetop but not the oven because they did not use it. He cleaned the refrigerator. (Ex. 1, Security/Damage Deposit Agreement, ¶¶ 4, 8, 9.) He changed the light bulbs. (Ex. 1, Security/Damage Deposit Agreement, ¶ 5; Ex. 5, p. 3.) He notified plaintiffs of electrical problems because the bulbs were burning out. (Exs. 4, p. 1; 5, p. 4.) Plaintiff Marie Gerrity found that the replaced bulbs were not the same wattage and her husband replaced the bulbs.

Defendant Addivinola swept the garage and cellar. (Ex. 1, Security/Damage Deposit Agreement, ¶ 8.) They had not used all of the beds but washed some blankets at the laundromat.

The washing machine broke before defendants moved out. Defendant Addivinola found a person to repair the washer. (Ex. 21.) Plaintiff Marie Gerrity was not surprised the washer broke because it had "seen a lot of use." She told defendants to leave the linens in the laundry room and she would take care of them. (Ex. 5, p. 2.) Defendant Cellucci left the linens as directed and stacked the pillows. (Ex. 24S.)

6

The DVD player stopped working before defendants left the house. Defendants bought a new DVD player and left it in the box. (Ex. 5, p. 4.) Plaintiff Marie Gerrity complained at trial that the new DVD player was not installed.

Defendant Addivinola believed they left the house in a condition comparable to its condition when they moved in. Defendant Cellucci believed the house was clean when they moved out, although she agreed the refrigerator was "not perfect" and the laundry room was "a little bit dirty." (Exs. 24F, K.) Defendant Addivinola did not take photographs and did not contact plaintiffs for a mutual inspection. (Ex. 1, Security/Damage Deposit Agreement, ¶ 12.)

Because one pod remained at the property, defendant Addivinola was at the property when plaintiffs and their son arrived on 6/14/14, the day of defendants' departure. Defendant Addivinola also wanted to meet plaintiffs because, he testified, he is "a pretty friendly guy." Defendant Addivinola spoke to plaintiff Peter Gerrity[1] about the door closer and garage handle and stated he would remain in the area to make sure the remaining pod was removed. Defendant Addivinola gave his phone number to plaintiff Peter Gerrity and left. He never met plaintiff Marie Gerrity. Another tenant moved into the house five hours after defendant moved out. (Ex. 7, p. 2.)

Plaintiff Marie Gerrity's description of the house on 6/14/14 differs significantly from that of defendants. After she found and removed baby socks and pistachios in the washer, she was able to return the washer to working order. She expected linens from one bed only because the house was rented to one couple. Instead, she found six or seven loads of laundry. She found laundry soap on the walls and floor and sand on the

---

[1] Plaintiff Peter Gerrity did not testify at trial.

7

floor. Based on those observations, she knew she was "in trouble" and went outside to speak to defendant Addivinola but he was no longer there.

She testified about the following damages:

1. broken tree branch;

2. broken garage door handle;

3. stain on the front porch;

4. broken and dirty outdoor chair;

5. broken screen (no claim);

6. dirty refrigerator;

7. stained sink;

8. messy drawers;

9. messy broom closet;

10. dirty laundry room floor;

11. sand on the top of the washer;

12. a raisin on the floor;

13. track marks on the floor that "could" have been caused by the Cozy Coop;

14. broken zipper on cushion;

15. urine stain in downstairs purple bedroom;

16. no sheets on beds;

17. damaged carpet in Lucy's bedroom, repaired with custom small rugs;

18. urine stain on carpet in Lucy's bedroom;

19. dirt and mold in Lucy's bathroom;

20. dirty floor in the boys' bedroom;

21. broken lampshade in Lucy's bedroom;

22. mold in boys' bathroom; and

23. dirty bathmat in boys' bathroom.

(Exs. 24A-24GG.)

Plaintiffs' damages claimed at trial are outlined in exhibit 31. The broken two-year-old door closer was repaired at a cost of $125.00. (Ex. 11.) The quote to repair the garage door is $47.00 but the repair has not yet been done. Plaintiff Marie Gerrity charged $35.00 per hour for twelve hours of cleaning performed by her husband, son, and her. A quote to clean professionally was $500.00. (Ex. 14.) She charged $50.00 per hour for her cleaning of three bedroom carpets. The quote to clean them professionally was $548.00. (Ex. 10.) She charged $105.00 for her washing the laundry. The cost to replace two matching lampshades was $80.00 based on lampshades at Folly, a store in Portland. The cost to replace the trash can was $10.00. The estimate to repair the kitchen oven hinge was $95.00. The actual cost was $143.00. (Ex. 15.)

The estimate to recarpet Lucy's bedroom with comparable wool carpet was $3,689.85; the quote was $5,012.29. (Ex. 12.) For the boys' bedroom carpet, the estimate was $2,170.50; the quote was $3,409.28. (Ex. 13.) The carpets have not been replaced because the cost is too great for plaintiffs to incur.

Plaintiff Marie Gerrity eventually found urine stains under the bed on the carpet in the boys' bedroom. She assumed she found these stains in the fall of 2014. Since defendant left the house, plaintiffs' dogs and a subsequent tenant's dog had been in the house. Plaintiff Marie Gerrity determined defendants' dog caused the damage because the other dogs were too large to go under the bed. She agreed at trial there is no way to know whether defendants' dog stained the carpet.

The estimates to repair the hardwood flooring and front porch were $1,995.00 and $3,384.00, respectively. Plaintiffs tried unsuccessfully three times to clean the stain on the vanity and charged $105.00 for their efforts. Replacement of the vanity will cost

9

$1,500.00. Replacement of the damaged ten-year-old cushion zipper will cost $50.00. Replacement of the broken garden hose will cost $31.50. New throw rugs will cost $126.00 and a new sheet, $48.30. The estimate for miscellaneous repairs to the patio chair, refrigerator, and cabinet, removal of the tree branches, and replacement of exterior lights totaled $200.00.

On June 19, 2014, plaintiff Marie Gerrity emailed defendant Addivinola and inquired about the carpet damage in Lucy's bedroom. Defendant Addivinola responded that his dog damaged the carpet and "[o]bviously, I will pay whatever you deem as appropriate." (Ex. 22.)

On July 12, 2014, plaintiff Marie Gerrity emailed defendant Addivinola and expressed her extreme dismay at the condition of the house. (Ex. 7.) She stated, "[o]ur house is not a rental property being churned for income – it is our home." (Ex. 7.) As discussed above, the house is rented continually to pay its expenses.

Although she had never met defendant Addivinola except to say hello as she walked past him on 6/14/14, in her email she labeled his placing a throw rug over the repaired carpet "dishonest and devious." (Ex. 7.) She demanded total damages of $6,877.35, which included recarpeting two upstairs bedrooms so the carpets, installed in 2000, would match. By July 12, 2014, two tenants had occupied the house after defendants moved out.

Plaintiffs did not return the security deposits and did not send a "written statement itemizing the reasons for retention of the security deposit" to defendants' last known address. 14 M.R.S. § 6033(2); (Ex. 5, pp. 3-4.) Defendants did not pay the $3,177.35 demanded after deduction of the security deposits plaintiffs retained. Defendants demanded unsuccessfully the return of the security deposits. (Ex. 9.)

10

Plaintiff Marie Gerrity testified plaintiffs have incurred attorney's fees of $6,000.00. Defendant Cellucci testified defendants have incurred more than $5,000.00 in attorney's fees. No attorney's fee affidavit or other evidence on this issue was offered.

At trial, plaintiffs demand increased to a range of $9,777.15 to $13,923.76 and twelve additional items of damage were added to the original list. (Exs. 7; 10-15; 31.) Defendants denied responsibility for these additional items of damage. Both defendants had previously rented several apartments without problems and had never encountered any controversy like this dispute with plaintiffs.

Conclusions

1. Plaintiffs' Complaint

The court notes that plaintiff Marie Gerrity and defendants have distinctly different views of what constitutes "reasonably clean and rentable condition," the condition in which defendants must leave the house pursuant to the lease. (Ex. 1, § 3(d).) Defendants are starting out with their young son and dog. They likely will always have pistachios in their washing machine and raisins on their floors. Their lives may be the better for this.

Further, the degree of outrage and hyperbole reflected in plaintiff Marie Gerrity's July 12, 2014 email and the fact that a photograph of one raisin on an otherwise presentable floor was offered in evidence are troubling and affect the court's assessment of her testimony. The expectation that tenants will leave the house "spotless and beyond presentable" is not reasonable and is not required by the lease. (Ex. 7; Ex. 1, § 3(d).)

The issue is, however, whether defendants complied with all of the lease provisions. They did not. (Ex. 1, §§ 3(c)-(d); Security/Damage Deposit Agreement, ¶¶ 3, 4, 8, 9.).

11

It is unclear on this record when the additional items of damage plaintiffs claimed at trial were identified. (Exs. 7; 31.) For example, plaintiff Marie Gerrity only assumed she observed the urine stains in the boys' bedroom in the fall of 2014. The house was rented three times during the fall of 2014 after the defendants moved out. One tenancy included a dog and plaintiffs' dogs were present at the house during that time.

Plaintiff Marie Gerrity discussed the damage to the vanity and the broken tree branches in her July 12, 2014 email. (Ex. 7.) The cost to clean the vanity was included in exhibit 31. The cost to remove the tree branches cannot be determined because it is listed in a group of damages. (Ex. 31.)

Of the damages itemized in plaintiff Marie Gerrity's July 12, 2014 email to defendant Addivinola, defendants are responsible for the following:

1. recarpeting Lucy's bedroom ($5,012.29);

2. house cleaning ($425.00);

3. rug cleaning ($150.00); and

4. clean marble vanity ($105.00).

The door closer, garage door handle, and oven door hinge broke as part of normal wear and tear. Plaintiff Marie Gerrity instructed defendant to leave the linen. Her expectation that linen for only one bed would require washing was not reasonable. Defendants are not responsible for the lampshade and garbage can. Because the urine stains found on the carpet in the boys' bedroom cannot, on this record, be traced to defendants' tenancy, they are not responsible for recarpeting that bedroom.

2. Defendants' Counterclaim

Section 6033 and the parties' lease require mailing a written statement of the reasons for retaining any portion of a security deposit to the lessee's last known

12

address. 14 M.R.S. § 6033(2) (2014); (Ex. 1, § 3(e).) Instead, on July 12, 2014, plaintiff Marie Gerrity sent an email to defendant Addivinola stating the reasons for her not returning the security deposits and for her requesting additional money. (Ex. 7.) The parties communicated through email or by phone after they signed the lease, their only written agreement. The parties extended the term of the lease without a writing, contrary to the lease provisions. (Ex. 1, ¶¶ 16, 27.)

"[A] course of performance inconsistent with any term of the contract is relevant to show a waiver of that term . . . ." Blue Rock Indus. v. Raymond Int'l, Inc., 325 A.2d 66, 78 (Me. 1974). In McClare v. Rocha, a case involving the Maine Uniform Electronic Transactions Act, the Law Court stated with regard to a motion for summary judgment:

> [T]he use of email by both sides without concurrent reservation or qualification indicates at least a dispute as to the material fact of whether there was some agreement to conduct the transaction by electronic means. Prior email communication regarding the sale of this property is relevant in determining whether there was consent, although the parties' prior course of conduct is not determinative.

2014 ME 4, ¶ 15, 86 A.3d 22.

The Law Court has approved deviating from a strict interpretation of the requirements of 14 M.R.S. § 6033 (2014). In Suarez v. Osgood, the court found that a short paragraph stating that the landlord intended to retain the security deposit for unpaid rent was a sufficient statement of his reason for retaining the deposit, even though it was not in an itemized form as required by the statute. 1994 Me. Super. LEXIS 195, at *13-14 (May 11, 1994).

Section 6033 was enacted in 1977, prior to widespread public use of email. Although a mailing to the lessee's address would be necessary if the lessor was returning a security deposit, such was not the case here. Plaintiff Marie Gerrity's email, which informed defendants of the reasons for retaining the deposits, fulfilling the intent

13

of the statute, and the parties' course of performance throughout the term of the lease, support a deviation from the strict requirements of the statute. Cf. Haley v. Poulin, 1992 Me. Super. LEXIS 267, at *1-2 (Nov. 16, 1992) ("Security deposits on residential rental units are carefully regulated by statute. The obligations of the landlord are set forth with precision.").

The entry is

> Judgment is entered in favor of Plaintiffs Marie Gerrity and Peter Gerrity and against Defendants Nicholas Addivinola and Angela Cellucci. Plaintiffs shall retain the $3,700.00 security deposits and are awarded an additional $1,992.29 in damages, plus prejudgment interest at the rate of 3.13%, post-judgment interest at the rate of 6.27%, plus costs.

> Judgment is entered in favor of Plaintiffs Marie Gerrity and Peter Gerrity and against Defendants Nicholas Addivinola and Angela Cellucci on Defendants' Counterclaim.

Dated: September 17, 2015

Nancy Mills
Justice, Superior Court

14

ANNE TORREGROSSA ESQ
BRANN & ISAACSON
PO BOX 3070
LEWISTON ME 04243-3070



AUBREY RUSSELL ESQ
SHANKMAN & ASSOCIATES
472 MAIN ST
SUITE 1
LEWISTON ME 04240